Jones, Chancellor.
The question is, whether the salary of the defendant in error ceased on his suspension by the Classis of Albany, or Continued during his suspension, and until his pastoral connection with his congregation was dissolved. It is conceded that this question depends, for its Solution, upon the contract between the minister and his congregation or church. The contract is contained in the call, taken in connection With the rules and constitution of the Reformed Dutch Church, to which both the pastor and the congregation, by the call, stipulated and agreed to remain subordinate.
The question,
*499 It appears by tbe record, that the defendant in error was called by the plaintiffs in error to be their pastor. The call gives a summary of the duties which appertain to the office of pastor, and which the defendant undertook to perform; and to free him from wordly cares and avoca lions whilst he was dispensing spiritual blessings to them, the plaintiffs in error promised and obliged themselves and their successors, to pay to him the sum of $1500 of money of account of the U. S., yearly and every year, in quarterly payments, as long as he continued their minister in the said church, and remained unmarried; and from and after the time of his marriage, they promised and obliged themselves and their successors, to pay him the additional sum of $250 of like money, during the continuance of his ministry in their church.
The call.
The defendant in error contends, that by this contract, his salary was to continue as long as he should remain in office; and the plaintiffs in error insist, that his continuance depended upon his performance of the services, and his discharge of the duties of-his office.
Points.
*By the terms of the contract, the salary of the defendant was to be paid him yearly, during the continuance of his ministry in the church to which he wassailed; and he continued the minister of that church until the 26 th of ^une’ 1821," when his pastoral connection with the plaintiffs in error was regularly dissolved.
Defendant in ed raids ter til mi 2Stb'
But the performance of the duties of the office, is said to be the consideration and condition of the promise to pay the salary; and it is contended that these services must first be rendered by the minister to his congregation, before he is entitled to demand the stipulated compensation from them; or, in other words, that the performance of the duties was a condition precedent to the right to the salary.
ordinary employments of servants, and contracts for service, where no special agreement regulates the rights obligations of the parties, the rule is, that the servant to earn ^is wages by the service he is to render: he consequently can claim no wages until he has earned them by his services; and in an action against hi.*- (wsplaypr for eom *500 pensalion, to entitle him to recover, he must show that he has performed the services required by the contract or employment, or has been ready, able and willing to perform them. But this is a special agreement, by which the parties have made their own provisions for the performance of the duties of the pastor, and the payment of his salary; and have referred to the constitution and ordinances of the Be-formed Dutch Church, to which they were subordinate, for the rules which are to govern them in their spiritual obligations, and in their relation to each other of congregation and pastor. By the contract, as I understand it. the minister was to be entitled to his yearly stipend as long as he remained in the office of the ministry, and continued to be attached to that congregation. The obligations imposed by the call on the pastor, taken in reference to the rules and constitution of the church, were the condition of his right to continue in the pastoral office; and the failure to observe and fulfill them, exposed him to removal by the ecclesiastical judicatory, ^having cognizance of the offense. But the call does not make the observance of those obligations the condition of the payment of the salary; the continuance of the defendant in error as minister in the Beformed testant Dutch Church in the city of Albany, is expressly made the condition on which his yearly stipend is to be paid to him. The salary, in is true, is given to free him from' worldly cares and avocations, whilst he was dispen-33 . . smg spiritual blessings to the congregation; but it was to continue to be paid, not as long as he fully and faithfully discharged his duties, but as long as he continued the minister in the church of Albany. It was during his continuance in the ministry in the church to which he was called, and not during his faithful discharge of his duties as minister, that the salary was, by the call, to be paid. In a suit on this contract for his salary, it was sufficient for him to show that he was the minister of the congregation during the period of time for which he claimed his stipend, and it was not competent for the plaintiffs in error to repel the claim by the plea or proof on their part, that he had failed in the performance of the services required of him. How* *501 ever delinquent he may have been, so long as the forbear* congregation, or the superintending powers of the assemblies of the church, suffered him to remain in his °®ce> he continued to be entitled to his compensation. Extreme cases might indeed occur, (such as a conviction for a crime,) which would be regarded as a virtual dissolution of the contract, and destroy the right of the pastor to his salary; but it must be an event or occurrence which, on general principles of law, would terminate his relation of pastor, to his people, to produce that effect. In other cases of non-performance of duty, he must, notwithstanding his delinquency, be entitled, until he is removed from his office, to the annual stipend provided by the covenant for his support. If the contract makes the faithful performance of the services of the minister, a condition precedent to his right to his salary, and the plaintiffs in error were entitled to set up his delinquency in a court of law as a defence against his claim, *must it not follow that the failure of performance, from whatever cause it might proceed, would be a conclusive objection to a recovery ? Upon that construction, a clergyman, disabled by sickness or other casualty, from performing his pastoral services, might be deprived of the means of subsistence during the term of his disability.
*499 In ordinary contracts of formance cedent°n ^
*500 ment.
precedent, Performance not a condi-
continuance minister is the condition,
*501 But it was conceded, that such disabilities must excuse the pastor, and that his salary would not be suspended during his occasional interruption in the discharge of his parochial duties, from causes which he could not control. In the present case, the suspension of the services of the pastor was the consequence of his own misconduct; and it is truly said, that the same indulgence is not due to such intentional delinquency, as would be accorded to an involuntary failure in the discharge of the duties of the office. But does it follow, that every wilful delinquency is a cause of forfeiture of salary ? Was it the intention of the parties to this contract to make the full and faithful performance of all the obligations and duties, while the pastor is not actually disabled by some casualty from performing, a condition precedent to his right to compensation for his *502 services ? If so, the observance and fulfillment of all the obligations imposed on him by the call, and which he the power to fulfill, must be shown, to entitle him to any compensation for any service he may have rendered. The official functions of the pastor may all be performed with the best diligence, zeal and ability in his power, and yet he may fail in the observance of some important moral obligation; he may be led into error of judgment in matters of faith, or he may, at some unguarded moment, yield to temptation and fall into sin. Is he to be punished for these errors and transgressions by the loss of his stipulated compensation, for the time and talents he may have devoted to his flock? The plaintiffs in error, themselves, disclaim a construction of the covenant so narrow and illiberal. They admit that deviations from the holy walk and conversation enjoined upon him, which are not habit-' ual, and which are followed, when they occur, by repentance, and the best atonement in the power of the offender to make, are no obstacles to his claim to compensation for *his services. But they insist, that gross offences and wilful defaults, which expose the delinquent to suspension or removal from office, are conclusive objections against his claim; because he is, in such cases, disqualified by his own misconduct from fulfilling the obligations of his call. I observe no such distinction in the contract. If the faithful performance of the services is a condition precedent, and the consideration of the engagement to pay, then a failure in performance from any cause, other than the physical disability of the incumbent, or the act or default of his employers, may be fatal to the right to demand it; and if the continuance in office is the condition and consideration of the promise, then the defendant in error was entitled to his salary as long as he remained in office.
In this case, the plaintiffs in error, by their call, stipulated to pay the defendant in error his salary as long as he continued the minister of the congregation. I see no sufficient reason for annexing to that engagement the implied condition of the faithful performance by the minister of the services required of him by the contract, as the eon *503 sideration and condition of the promise to pay. He was-, bound to the service of the sanctuary, and attached by his calling to his congregation for life, and-during the continuanee of those relations, which the church authorities alone could dissever; and’he was not at liberty to pursue any secular employment for his support. It was just, therefore, that the provision for his maintenance should continue as long as those relations subsisted which restrained him from other pursuits. That appears to me to be the principle fairly deducible from the terms of the contract; and it is, in my judgment, the rule which ought to govern. It is simple, and free from difficulty in its application; and in principle, conforms to the spirit and policy of the system of church government under which the contracting parties formed their connection, Tb e obj ection of the plaintiffs in error to pay for services which the defendant in error by bis own misconduct was disabled from performing, is plausible ; but a view of the principal operation of the principle will show its fallacy as applicable to this contract, and *demonstrate the .wisdom and policy of the rule which makes the continuance in office the sole test of the right to salary, and thereby secures to the minister of the gospel a provision for himself and family, and protects him from all inquiry into his delinquencies and failings in an action for his stipend.
If the failure of the clergyman, in the performance of the services required of him, by reason of his own.misconduct, were to be a defence to an action at law for his salary, to sustain the defen'ce, the misconduct which was the causé of the failure must be shown; and how are the charges against him to be substantiated? Accusations implicating the moral character of the accused, and which are preferred against him to deprive him of the benefit of his contract, must surely be open to refutation on his part, and must be fully established by his adversaries, before they1 can be admitted to bar his recovery. Is not the character of such litigation, and the probable complexion, of the evidence to sustain and repel the defence on which it is. to turn, sufficient ground for excluding it from the civil tribunals? Can *504 the charge of infidelity or immorality against a minister of the gospel, be a fit subject in a court of law? Or does not the investigation of such charges more properly uppertain to the spiritual assemblies of the church to which the parties belong? Those who officiate in the ministry of the word, are amenable to the ecclesiastical judicatories for their offences and misbehavior; and admonitions and censures of the spiritual authorities, to which the minister is subordinate, suspension from the exercise of the functions of his office, or a dissolution of his pastoral connection with his congregation, according to the nature and decree of his aberration from the path of rectitude, may be fit visitations upon him for his offences; but they are chastisements for an ecclesiastical tribunal, and not for a court of law to inflict.
The founders of the ecclesiastical system of government for the church' to which this congregation belongs, felt the full force of these impressive considerations; and to guard against the mischiefs inseparable from public investigations *in the civil courts, of charges against a minister of the gospel, involving his.moral conduct or official duties, made them subjects of ecclesiastical cognizance exclusively, and vested the entire jurisdiction of all such offences in the assemblies provided for the government of the church.
This arrangement was wisely adapted to the relation that was to subsist between the minister and his congregation, and the duties required of the pastor in his interesting and responsible situation. The obligations imposed on the minister by the call, are not confined to the actual services he was to render to the congregation immediately under his charge. They extend also to his own private life, and his moral and religious conduct. He is faithfully to officiate, in his character of pastor for his congregation, in all the services of the church and to fulfill the whole work of the gospel ministry; and he is to observe, in all the relations of private life and his own demeanor, a line of conduct with his moral obligations and religious duties, and calculated and tending to maintain the honor of religion and promote the success of the gospel. ' These obligations *505 and duties partake so largely of a religious and morai char- and are so intimately connected with the relations of , domestic lire and the moral conduct of the pastor, that an into charges of misconduct in those respects, ought to be of ecclesiastical Cognizance. To expose the 'infidelity and immorality of a minister of the gospel, on a public trial before a court and jury, in an action for his salary, or to conduct an inquiry into the soundness of his faith, and religious opinions before a court of justice, would tend to produce unfavorable impressions of religion on the public mind, and, in aggravated cases, the disclosures would too often scandalize the public ministry of the gospel, so important to the well being of society, and might materially impede its success in the great and interesting work to which it is devoted.
It was foreseen, by the ecclesiastical assembly which ordained the rules and constitution of the Eeformed Dutch *Ohurch, that the'frailties of human nature would sometimes lead to aberrations from the religious and moral ob-. ligations of those who might be in the office of the ministry ; and they so organized the ecclesiastical system, and so framed the contract which was prescribed for the relation of congregation and pastor, as to refer all matter relating to those obligations and duties, and the punishment of transgressions against them, to the ecclesiastical judicatories, in exclusion of the cognizance of the civil tribunals. They have the right, under the free institutions of our country, to the full benefit of this arrangement; and the wisdom of its provisions are exemplified in its practical operation.
The parties to this controversy themselves, refer to these rules and constitution as the laws to which they are to conform, and profess to rest:the construction of the contract on those ordinances, and the subsequent articles explanatory of them. Let us turn to those instruments, and see what the rules are which they apply to this subject. First, it is declared that a minister of the word, being once lawfully called in the manner prescribed by the articles, is bound to the sanctuary as long as he liveth, and is not at liberty to devote himself to any secular vocation, except for great and *506 important reasons, and with the consent of the classis; that a minister being lawfully called, may not forsake the the church or congregation where he is regularly settled, in order to accept a call elsewhere, without the consent of the consistory and deacons, and the approbation of the classis; that the consistory, as representing the congregation, shall be bound to provide the ministers with a decent support, and shall not forsake them without the approbation and decision of the classis: and that if they commit any gross public sin, which is scandalous to the church, or punishable by the city magistrates, they shall be suspended by the consistory of their own and the next adjacent church; and it shall be left to the decision of the classis, whether they shall be wholly deposed or not. Secondly, classes are invested with the general power of ordaining or deposing ministers, and may suspend or remove from office, as the circumstances of the case, or the welfare of the *church may require; and thirdly, the offenses that deserve the punishment of suspension or removal from office, are declared to be all such sins and gross offenses which render the perpetrators infamous before the world. A specification is given of some of the offenses thus punishable; and amongst others, false doctrine or heresy, faithless desertion of office, and habitual drunkenness, (the offense for which the defendant in error was removed,) are specially enumerated. Besides these punishments of suspension and removal from office for public offenses, admonition and censure are prescribed for private offenses and secret sins; and the obstinate rejection of the admonition may be followed by severer penalties.
These provisions show, that the faithful observance by the minister of his moral and religious obligations to his church or congregation is to be enforced, and his transgressions punished by the ecclesiastical assemblies, and not to be made the subjects of judicial inquiry in courts of justice. To these ecclesiastical ordinances the congregation and the minister both acknowledge themselves to be subordinate; and accordingly, in this case, the minister was at first admonished to abstain from the repetition, of *507 °^enseí an<3> admonition failing to produce arnendment, suspension followed, and finally removal from office.
T , . It is conceded that the defendant in error, by accepting ca^> assumed to perform faithfully all the duties required of him as the pastor of the congregation ; and the wilful neglect of those duties, or a gross offense against the obligations imposed upon him by the call, or the ordinances and articles to which he engaged to be subordinate, subjected him to censures, admonitions, and punishment by the ecclesiastical judicatories. But the faithful performance of those duties, and the observance of those obligations, were not made a condition precedent to the payment of his salary, either by the terms of the covenant, or by the spirit and intention of the call, and the rules and constitutions to which it refers. The pastor'was bound faithfully to fulfill the obligations of his call, to oppose a steady and efficient resistance to temptation, and, by word *and example, always to promote the spiritual welfare of his people. He unhappily failed in his solemn engagement. A besetting sin prevailed over his enlightened understanding, and obscured his lustre. "With a Christian spirit, the consistory of his congregation, and the classis of Albany, to whom the case was referred, sought to reclaim him from the influence of his pernicious habits, and to restore him to the church. He was unable to conquer the propensity to which he had yielded; and the permanent interest of religion demanded his removal from his office. His pastoral connection with his congregation was ^dissolved, and his claim to his yearly stipend was at an
The two events which the constitution of the church contemplates as terminating the ministry of the pastor, are his death and his removal by the classis from office; and so permanent is his connection with his congregation considered, that provision is made for him during the remnant of his life. After he should .be disabled by age or infirmities, from performing his pastoral services, he is allowed to retain the honor and style of his office, and is to be provided with an honorable support by the churches to which *508 he hath administered. The congregation can never forsake or discard him: nor can their obligation to support him , , , ’ . , , , ,. , . „ i . be dissolved, otherwise than by the dissolution or his pastoral connection with them. So careful were the provident framers of those constitutional ordinances, to secure those who devoted themselves to the work of the gospel ministry from want during their lives, or till their deposition by the regular authority of the church, that they denied to the congregation to which they ministered, the power to dissolve the pastoral connection, or the right to withhold the stipulated compensation from the minister; but referred those matters to the higher assemblies, the classis in the first instance, and the particular and general synod by way of appeal.
The defendant in error was the regular pastor of the plaintiffs in error, and that connection could not be severed by the plaintiffs. If he was guilty of a public and notorious *offense, which rendered his appearance in the pul pit highly offensive, his consistory might interfere, and shut the door against him by suspension, and refer him to the classis for trial. In that assembly, the accusation against him was to be investigated, and the final sentence to be pronounced. The matter could not be drawn into the courts of law, or made the subject of judicial cognizance. If the accused was guilty of the charge, his sentence was to be pronounced by the classis, and could only be reviewed by a higher judicatory. The offender may, to prevent scandal, be prevented from the exercise of his office until he is tried by the classis; but he is to be referred to that assembly for trial; and if found guilty, that assembly is to declare and inflict the punishment. Courts of law do not interfere with the discipline of the church, or the punishment of ministers, by the sentences of the ecclesiastical authorities; and if the right of the defendant in error to the salary for which he sues, has been lost to him, it must be the sentence of the classis which has produced that effect; and the plaintiffs in error must rest upon that sentence alone for the support of their defense to the action at law. The plaintiffs in error, in effect, admit this *509 to be the rule 5 and contend that they have brought them* selves within it. They admit the offense of which the de* fendant in error was accused, to be of ecclesiastical eognizance j but they insist that the charge has been established in the ecclesiastical judicatories, and rely on the sentence as a conclusive bar to the action at law. Is that the defense of the plaintiffs in error? By that rule the inquiry will be, what sentence has been pronounced in this case, and what the legal effect of that sentence is upon the civil rights of the defendant in error.
It appears that the defendant in error was, by a regular sentence of the classis of Albany, suspended from the office of the ministry, and was under the sentence of suspension during the whole of the period for which he now claims the payment of his salary; and it is contended that the right to salary was suspended by that sentence, and *was never afterwards removed; but was wholly extinguished by the subsequent sentence of removal.
The classis of Albany had the right to dissolve the pastoral connection between the defendant in error and his congregation, or to suspend him from the office of the ministry, at their election. If they had dissolved the pastora¡ connection, they would have extinguished his right to ' J , 0 0 his salary; and when they did finally pronounce the sen-of removal, the contract was dissolved. But they chose the milder course of suspension. How could that sentence deprive the pastor of his right to the salary covenanted to be paid to him during his continuance in the ministry, under this call ? A sentence of suspension does not remove the incumbent from his office: but inhibits him from the exercise of his official powers and functions. The defendant in error continued the pastor of his congregation during his suspension, and until the severance of his official connection with them. The office of minister in that church was full, and no successor could be called. If, then, the legal effect of the covenant was an engagement of the plaintiffs in error to pay the salary as long as the defendant in error continued the minister in their church, as I have endeavored to show the true construction of the *510 call to be, the sentence of suspension did not destroy or suspend his right to his stipend, nor interpose any obstacle to his recovery. Then, did the constitutional ordinances give- that effect to the sentence ? I ana Unable to discover any provision in those articles which, either in express terms, or by any necessary implication, suspends the salary of a suspended ministerand the spirit of the system, according to my views, is wholly averse to giving the sentence that operation. The penalties which the ecclesiastical judicatories are authorized by the constitution to impose, are, admonition, censure, suspension, and removal from office. The power to punish, by the forfeiture or loss of salary, is not delegated to them; Unless, therefore, such forfeiture results from the sentence of suspension, as the necessary consequence of it-, no- such forfeiture could accrue by that procedure. The silence of the ordinances on the subject, and the general spirit of benevolence "-they breathe, conclusively repel the presumption that so severe a punishment of the delinquent, while he was under the discipline of the church, was intended.
*509 Dissolution only, not suspension, deprives a minis-Church of his salary.
He continues fagM^suspension.
*510 But the plaintiffs in error insist that the sentence of suspension, being for a public and notorious offense of the defendant in error, wUs decisive - evidence of his failure, by his own wilful default, in performance of the services required of him by the contract; and on that ground they put their defense in the court below. If my construction of the call is correct, the continuance of the salary of the pastor depended on his - continuance in office; and in that view of the case, it is manifest that the sentence of suspension would be- no defense against the claim.
But assuming that a dereliction of duty, or the disability of the incumbent, from his own misconduct, to fulfill the obligations of his call, would justify the ecclesiastical assemblies of the church in forfeiting the salary of the offending pastor, can a sentence, temporarily suspending him from the exercise of his functions, have that effect, or be sufficient evidence to a court of law of such a wilful default as to work a-forfeiture ? Considered as evidence of delinquency, it must refer to the time which precedes the *511 sentence itself, and canhot apply to the period of its con-for the offenses which are the cause of the sen* tence, must necessarily precede it; and the operation of them upon the official functions of the accused must necessarily cease upon his suspension from office. Yet, it is not contended that the delinquency would be a defense against a recovery of the salary anterior to the sentence1 of suspension ■; or that such sentence would be sufficient evidence of such' anterior delinquency, to sustain a defense against the claim for salary during the period of the 'im' puted delinquency, but before his suspension. If, then, the sentence of suspension is evidence to sustain the defense on the ground of failure of performance, it must be because that sentence itself prevented the defendant in error from rendering the services' required of him by the call, and consequently showed a failure of consideration for the portion of his salary for which he sued. It is true that he did not and could not perform the duties of his office during *the period of his suspension; and it is not the offense which led to that sentence that was the immediate cause of the failure in engagements.' He desisted from his parochial employments in obedience to the peremptory order of" a superior power, which his'call bound him'to obey. Could the suspension of his official duties, imposed upon him in the exercise of the discipline of the church, and to which he is compelled, in obedience to a paramount duty, to submit, be justly imputed to him as a default, 'and made the" cause of refusal to continue the payment of his salary during the time of his probation? Such a defense, on general principles," could not prevail; and neither the terms of the call, nor the rules of the constitutional ordinances to which.it refers, requiring that the provision for the support of "the pastor should cease during the period of his suspension from office, it would, in my judgment, be against the good sense and sound construction of the covenant, so to extend it by implication as to give it that operation.
It was said that the suspension of the defendant in error from office, for the offense, was the initiatory step to his *512 tria!, and is to be taken in connection with the final sentence of removal; and that the legal effect of the final sentence was to convict him of the offense for which he was suspended; and to show that the suspension and the failure of the consideration for his salary, were the immediate and necessary results of his own delinquency and misconduct.
By the 79th article of the rules of church government of the Reformed Dutch Church, and the 72nd explanatory article, ministers guilty of public and notorious misconduct, which would render their appearance in the pulpit unbecoming and highly offensive, are to be suspended from the exercise of their office by the consistory, until they are tried by the classis; and the proceedings of the consistory, in such cases, is declared to be a prudent interference, and a binding over of the person accused to the judgment of his peers. The' offense of which the defendant in error was accused, was such as to expose him to that proceeding ; and if he had been suspended by the consistory and referred to the classis for trial, it might have been contended *that the suspension, trial and final sentence, were parts of the same proceeding, having for their object the conviction and deposition of the offender for the offense with which he stood charged. I am not prepared to say that such a suspension would deprive the accused minister of his provision for his support during his trial, and while his connection with his congregation still continued; or that it would be evidence to a court of law of such defaults on his part as to defeat a recovery of the stipulated compensation for services, which he was, by that suspension of his functions, hindered from performing. But whatever the effect of such a proceeding might be, this is not such a case. This sentence of suspension is widely different from that of the consistory: and differs from it in its object and purpose. The consistory suspends the minister who is charged with an offense for which he is to be tried, and bind him over to the judgment of his peers. This is a function of the classis; it contemplates no trial, nor any ulterior sentence of deposition. It was essentially discipli *513 nary, and intended to reclaim the offender from his habits, and avert the necessity of severer punishment.
The two sentences given in evidence by the plaintiffs in error, on the trial at law, were the resolution of the classis of Albany of 2d December, 1820, suspending the defendant in error from office, and the resolution of the same classis of the 26th June, 1821, dissolving his pastoral connection with his congregation. These two resolutions are distinct and separate acts. They have no connection with each other. The last sentence was not founded on the first, nor the consequence of it; but was a new exercise of. the powers of the classis, recommended by a resolution of the general synod, advising a dissolution of the pastoral con: nection between the defendant in error and his congregation; and it was adopted in pursuance of that, recommendation, and avowedly for. the purpose of carrying it into effect.
Nature of the suspension.
The first resolution or sentence of suspension was made after an investigation by the classis of the truth of the charge of inebriety, preferred by the plaintiffs in error against the defendant in error, by a representation in .writing *from them, to the classis, whereby they earnestly entreat that assembly, to take such measures touching the premises, as the constitution and rules of the Deformed Protestant Dutch Church prescribe, and the nature of the case required. This was a complete and perfect decision and sentence upon the whole case. It established the guilt of the accused, and settled the measure of his punishment. A continuance of. the offender in guilt might be sufficient cause for his deposition by the classis; and an obdurate adherence to his denial of the charge after his conviction, and the neglect and failure to give the classis evidence of repentance and reformation, might, after reasonable time allowed him for the purpose, justify that judicatory in proceeding to dissolve this connection with his congregation; but, until an effectual sentence of dissolution was pronounced, the offender continued under the disciplinary sentence of suspension, and the chastisement it inflicted was the only punishment for his offense, That sentence did not dissolve the connection between the defendant in error and his congregation* *514 but, on the contrary, it acted upon him as the pastor of that congregation. The object and avowed design of it was to produce reformation. It emanated from Christian love, and administered to the offender the salutary correction of a child who had strayed from his filial duties, to preserve him from perishing, and to bring him back to the paternal roof ; and he surely should not be left without the means of subsistence during the period of his probation. The suspended minister, it is true, is prohibited from performing his pastoral services, and his disability is the consequence of his own misconduct; but he continues in his official connection with his congregation. The sentence which interdicts him from performing his duties is the sentence of a power to which he is bound to submit, and which is equally obligatory upon the congregation. That power might have dissevered his pastoral connection; and if the offense had been so aggravated as to require it, the presumption is, that his connection with his congregation would have been dissolved.
*The classis to whom it belonged to decide, in the hope óf reclaiming the offender, suspended him from the exercise of Ms official duties until he should reform; but they did not absolve the congregation from their obligations to him, nor free him from his engagements to them. He was still bound to the service of the sanctuary, and attached to the congregation of the Reformed Dutch Church in the city of Albany. He was not at liberty to devote himself to any secular vocation; and if his salary was suspended, he was left without support from his congregation, and under engagements which prohibit a resort to worldly employments for the supply of his wants. The ordinances of the church have not declared the forfeiture or suspension of salary to be a consequence of á sentence of suspénsion from thé office óf the ministry; nor are the ecclesiastical judicatories authorized to make it so; and the spirit of liberality, forbearance and Christian charity which the whole system breathes, forbids us to believe that they intended so severe a penalty as the entire deprivation of support, tó be inflicted on any minister of the gospel, whose de *515 pendence is often upon his salary, as long as he is permitted to continue in his pastoral connection with the. congregation which has called him.
If the sentence of suspension, in this case, suspended the right of the defendant in error to his salary, it must be because the minister is disabled thereby from performing his pastoral services for the congregation; and if this sentence produced that effect, every suspension of the pastor, whatever the cause of it may be, must have the same operation. Mow, the pastor may be suspended by the classis for any departure from doctrine, morals or duty: the parties may appeal from the sentence; and until that appeal is determined by the higher assembly, it cannot be known whether the sentence of suspension was right or wrong. Suppose differences to arise between a minister and his congregation, on some point of doctrine or official duty, and he is accused of heresy or faithless desertion of office, and on the complaint of the consistory, *he is suspended by the classis, and appeals from the sentence; is his salary to cease until the controversy between him and his congrega tion is finally settled? Suppose the decision to be against him; is the forfeiture and loss of salary during his suspension, to be the penalty for asserting opinions which were erroneous; but which he may have conscientiously believed to be correct ? and if he prevails in his appeal, would it not be unjust to deprive him of his salary during the period of his suspension ?
But the sentence of suspension in this case was for wilful misconduct, and has been confirmed on appeal; and the defendant in errpr, it is said, cannot complain of a suspension of salary produced by his own misconduct; and which the regular authorities, by whose decisions he is bound, have pronounced to be just.
It has been shown, that if the sentence of suspension is a defence to the action for the salary, it is the failure produced by the sentence, in the performance of the services required of the pastor, which bars the recovery; and it will not be contended that a sentence of suspension for misconduct, operates differently from a sentence for faith- *516 leas desertion of office, or for heresy or public schism, unon the rights of the offender, under the covenant for ^ ° . . T , compensation for his services, in each case, it equally disqualifies him from performing the duties of his office, and is the consequence of his own irregular conduct. Gan it depend, then, upon the final determination on the appeal, whether the salary is to be suspended or not; and is the suspended pastor to lose or gain his salary, as he succeeds or fails in his appeal ? Then if the pastor erred in judgment upon a doctrinal point, and believing his own opinion to be orthodox, appealed from the decree of the classis against it, he must be punished for his error by the loss of his means1 of support; and if he retracts his error, he must still be precluded by the sentence from claiming his salary during' his suspension; because the original sentence was occasioned by his own fault. But suppose the pastor, who is suspended for an offence against morals, does not appeal, but gives such evidence of reformation *and repentance, as to induce the classis to revoke the sentence; this could not be done immediately. Suppose the classis to be satisfied with a probation of three months, or suppose them to require six months or a year to assure them of his sincerity and his self command ; the pastor, during all this time, would, by his suspension, be' disabled from performing his pastoral services ; and his own misconduct would be the cause of his disability. Shall he bé denied the' support which his congregation covenanted to allow him¡ and be thrown upon public charity for subsistence, during the period of his suspension and trial ? The spirit of Christianity forbids it; and I am satisfied that the spirit and.policy of the provident system of government to which these parties, in their contract, refer as their guide, and the supreme law of the church, is wholly opposed to it. The framers and the expositors of this excellent system of rules, impressed with the importance of this principle, and forseeing that aggravated cases might occur, and the irritated feelings of a congregation propel them to deny to their pastor the support they had stipulated to allow him, on, the ground of his failure to fulfill his obligations to *517 them, introduced a covenant in the call of the minister, whereby, as I interpret it, all inquiry into matters of such peculiar delicacy was precluded • and the right to the salary Pu* exclusively upon the continuance of the minister in his pastoral office ; referring it to the classis to terminate his right to his compensation in case of a failure in the performance of his duties, or such an offence against morals, or departure from sound doctrine, as to make his longer continuance in office, in the opinion of that assembly, improper ; but taking care that the pastor should be .supported by the congregation by whom he was called, as long as he was permitted by the classis to continue in connection with them. I cannot, therefore, consider the sentence of suspension, as suspending the right of the pastor to his salary during the time he was suspended.
It is objected that the congregation, if compelled to wait for a sentence of removal before they can disengage themselves from their pastoral connection with an unfaithful %nd immoral pastor, may be subjected for a long time to an onerous charge, without any consideration for it. I eon-fess I do not see the force of the objection. The pastoral connection ought not to be dissolved on light grounds; nor ought the congregation or its consistory to be the judges of the sufficiency pf the causes to dissolve it; but the consistory may pefer a complaint or accusation to the classis, and the classis have the power of deposing the minister; and whenever his misconduct shall satisfactorily appear to that assembly to require his deposition, a sentence of removal may be pronounced, which will sever his pastoral connection with his congregation, and thereby terminate his right to. the stipulated salary. This assembly must meet at least once in every three months, and may, in cases of emergency, be sooner called; and, if the welfare of the congregation, and the interest of religion require, it may apply the decisive remedy of deposition, as promptly as a regard to the just rights of the accused to an impartial trial and full defence will admit. A more effectual or speedy remedy cannot reasonably be required.
It is true that the deposed minister may appeal from *518 the sentence of removal: and an obstinate offender, by . pursuing his appeal to the highest judicatory, may create some considerable delay; but, if his original sentence dissolved his connection with the congregation, he will gain nothing "by his appeals, unless he is successful, for his salary. must cease with the dissolution of his pastoral relation; and, unless that relation be restored, by a reversal of the sentence which dissolved it, the right to the salary cannot be revived.
If, therefore, the classis of Albany had, on the first application, dissolved the pastoral connection of the defendant in error with the plaintiffs in error, instead of suspending it, his right to the salary, and their obligation to pay, would have ceased at that time; but having chosen the palliative course of suspension, and no valid or effectual dissolution having taken place until the month of June following, the connection of the defendant in error with the ^congregation as their pastor, continued to that time; and though he was under sentence of suspension, his right to his salary was, in my j'udgment, unaffected by that sentence, and he was entitled' to recover it.
The ecclesiastical j'udicatories are the tribunals to which both the contracting parties agreed to submit themselves, on their spiritual relations: their decrees, in the last resort, are conclusive, and cannot be impeached by either party; and if they refuse to dissolve the pastoral connection, but yet suspend the pastor, it must be intended that they had just grounds for the decision; and the congregation, however inconvenient or disadvantageous it may be to them, must conform to the sentence.
It remains to notice the cases and authorities to which the court has been referred.
Authorities considered.
The first in order was, an expression which fell from 1 1 Lord Mansfield, in the case of Martin v. Hinde, (Cowper, 437,) and which was relied oh as importing an opinion, that jn contracts between a pastor and his people, the services of the pastor are the condition, as well as the consideration of the salary. But a reference to the leading facts of that case, and the scope of the reasoning in which *519 the expression occurs, will show that it,is not applicable: . r , , , , ’ , . , , , intended by the learned iudge to be applied to such a , . .J , ° . contract as this case presents to us.
*518 Martin, v. Hinde, Cowp. 437.
*519 In the case cited, the defendant, who was the rector of St. Ann’s, Westminister,' had appointed the plaintiff to perform the office of curate in his church of St. Ann’s; and promised to allow him a yearly sum for his maintenance in the curacy, and to continue him to officiate in the church until he should be otherwise provided of some .ecclesiastical preferment, unless,, by any fault by him committed, he should be lawfully removed from the same. The curate had been appointed to the readership of the parish ; and two notices had been given by the rector to the curate, to quit the curacy by a given day ; and a successor had been appointed to the office, who had displaced the plaintiff", and officiated as curate during the period of time.for which a salary was claimed by the plaintiff. The material *question was, .whether the appointment of reader was an ecclesiastical preferment, within the sense of the, contract; and the court decided that it was not. ' It was further objected, that the plaintiff had no license from the bishop to.officiate as curate of the parish, and .was therefore, removable" at pleasure by the rector, and had been legally reproved from the office. The court inclined to the opinion" that there was sufficient evidence in the case, of an authority from the bishop to the plaintiff, to officiate as rector in the defendant’s church. It is in his discussion of this point, that Lord Mansfield uses the expression relied on. He observes, that the defendant, in his notices to quit, did not object the want of a license; and that if he had, the defendant might have immediately procured one; and then adds, “ If, after reasonable notice, he does not procure every qualification necessary *to enable him to . do , the duty, the defendant would be excused -from paying him the salary; for the plaintiff’s service as curate is not only the; consideration,. but the condition of -the salary.” It is manifest that the decision of the court on the point, turned on the fact of license by implication, and the waiver of the objection to the want of it; and did not rest in any degree on the posi *520 tion, that the plaintiffs service as curate was the consideration and condition of the salary. But giving it the full •' , . force of an adjudication, it would not govern this case, The. principle it involves, applied to the particular contract then under consideration, and had particular reference to the license as a qualification for the office. The' contract was substantially a general undertaking to pay for services. The only point in which it differed from the ordinary case of contracts for service, was the obligation of the employer to continue the plaintiff in his employment until he should be preferred.. But the plaintiff was at liberty to quit the curacy at pleasure; and, under such a contract, the performance of the services becomes necessarily the condition, as well as the consideration of the right of salary for it. It rested with the curate to perform the service, and thereby entitle himself to the stipend, or to quit the curacy, and' thereby relinquish his *right to salary at his election. His actual resignation, or his voluntary, though silent desertion of the office, would consequently terminate his right to the allowance for his maintenance in it; and, for the same reason, a culpable and continued refusal, or other neglect to perform the services the appointment required of him, would be a virtual dereliction and abandonment of the office, and discharge the employer from the obligation to pay the allowance, or continue the maintenance. The rector could not be bound to pay the salary when the service was no longer rendered.
The rule applied by Ld. Mansfield, to that case, was, consequently, correct; but that rule is not applicable to this contract, for the call in the case before the court, bound the pastor to the congregation for life, and the pastoral connection between them could not be dissolved by themselves; and the covenant of the plaintiffs in error was, to pay the defendant in error his stipulated salary as long as that connection should continue. But again, to understand the true import and bearing of the expressions of Ld. Mansfield, it must be borne in mind that they were applied by him to that part of the defense, which objected,„ to the plaintiff’s right to the sum allowed him for his main *521 *enancei on the ground of his disqualification for the office, alleged removal therefrom. The question on that point, turned on the efficacy of the notices to quit. ITthat notice amounted to a removal, and the rector had a right to remove at pleasure and without cause, then the title of the curate to the -salary he sued for, was defeated. The rector insisted that the curate was not licensed by the bishop to officiate as curate 'of the defendant’s parish; and, for that reason, was not duly qualified for the office, but removable at pleasure. The cou-rt inclined to the opinion, that the bishop had substantially and in effect, though not in form, licensed the plaintiff to officiate as curate of the parish; but held that the defendant had waived the objection, since, in Ms -notice to quit, he did not object the want of a license. But the learned judge justly observes, that if the plaintiff did not, on reasonable notice, procure every qualification necessary to enable -him *to do his duty, and of course a license, if -necessary, the defendant would not be bound to pay the salary: and the reason-he gives for the position is, because the services of the plaintiff were the consideration and condition of his salary. His obvious meaning was -that the plaintiff must be qualified to officiate as curate, and entitled to continue in the office notwithstanding the notice to quit the curacy, Or he cduld have no title to Ms salary, as he could not perform the service for which it was contracted to be paid. The plaintiff was employed by the defendant, to perform the functions of curate in his church of St. Ann’s; and for his services as curate, the allowance was agreed to be made him for his maintenance in that situation. But he had been displaced by the rector; and unless he possessed all the qualifies1 tions necessary to enable him to act as curate, and to entitle him to insist upon the contract of the rector to continue Mm in the curacy until preferred, he could not lawfully officiate in that capacity, and consequently could not entitle himself to the stipend for which he sued-. In that sense, therefore, the condition or the right to salary waa the service he contracted to perform. But that condition only required of the curate to possess the necessary *522 qualifications for the office, and to be ready and willing to, perform the duties of it. The actual performance of the service was not, even under that promise, held an indispensable pre-requisite to the recovery of his allowance; for it appears by the case, that: the plaintiff in that suit had not, in fact, rendered the service for the salary he demanded and recovered. The rector, acting upon the supposition of the right to remove him at pleasure,, and assuming the notice to quit to be an effectual removal,, had employed another curate who had performed the service; but, it was admitted that the plaintiff, was, ready to perform the duties of the office, but was hindered by. the intrusion of the substituted curate; and that was held a sufficient compliance with, the condition to entitle him to his stipend. The right to salary was tested by the efficacy of the notices to quit; and the intended removal of the curate from his office being inoperative, his title to his stipend, was *held complete, though the service had not been rendered. But that, case is itself an authority to show, that when the officer is duly qualified and ready to act, there must be an effectual removal from office by competent authority, to defeat the right, to salary; and, upon that principle, the right to salary in this case would continue, unless the classis chose to exercise the power to remove; and. the sentence of suspension, having for its object- the reformation,.and not the expulsion of the pastor, would be no defence against the claim.
The case of The First Religious Society in Whitestown v. Stone, was a contract of-the defendant to pay a subscription for the support of the Bey. S..F. Snowden, as a minister of. the gospel of said society, so long as said Bev. Mr. Snowden should administer the gospel in said society, and the subscribers reside within four miles of the meeting hous.e; and the question was, whether it was an obligatory contract, or depended wholly on the will of the subscriber. The court decided that the contract was valid in law; that the consideration was the preaching of the gospel by the Bev. Mr. Snowden; and as long as he continued to administer the gospel, and the defendant to reside within four *523 m^es’ was bound by the contract. It could not be dig* so^ve^ but by mutual consent, or cease to be obligatory until the minister' ceased to render the service. There the contract was, to pay so long as Mr. Snowden continued to administer the gospel in that society; and when.Mr. S. ceased to administer the gospel, then, and not till then, the subscriber would be absolved from his obligation to pay. Here the plaintiffs in error covenanted to pay so long as the defendant in error continued the minister in the church of Albany; and when the defendant in error ceased to be the minister in that church, as he did on the dissolution of his pastoral connection with them, and not till then, were they discharged from their covenant to pay him his salary.
*522 First Rel. Soc. Whitestown v Stone, 7 John. 114.
*523 The case of Dieffendorf v. The Reformed Calvinistic Ohurch Canajoharie, is more material to the present case. It was a case in error on certiorari from a justice’s *court. Dieffendorf was sued before the justice, for his subscription for the support of the ministry of the church, “ as long as the Rev. John I. Wack is and remains our regular preacher.” Wack had been tried and deposed by the classis of Montgomery for immoral conduct. He appealed from the sentence, which appeal was sustained. There were subsequent proceedings in the case which had been held irregular. The defendant" in the court below offered to prove by witnesses, that Wack was a man of immoral conduct, and guilty of drunkenness, profanity and other vices degrading to his character as a minister; but the testimony was rejected. The supreme court held that the justice was right in rejecting the testimony offered to criminate Wack; and the judge who delivered the opinion of the court said, that the only difficult question in the case was, whether Wack, in the sense of the contract between the parties, had remained the regular minister of the Reformed Galvinistic Church of Canajoharie; and he says that his conclusion is, that the relation of minister and congregation was not dissolved; and that the defendant below was bound to pay his subscription. The proceedings of the classis in that case, whereby Wack was deposed, were held irregular and void; and the court observed that Mr. Wack uniform *524 ly continued to exercise his ministerial office and character; but they put the decision upon the ground that the relation . / r ' . r tit - of minister and congregation was not dissolved.
*523 Dieffendorf v. Ref. Calv. Ch. of Canajoharie, 20 John. 12.
*524 So here the decision is, in my judgment, to be put upon the ground that the relation of minister and congregation between the plaintiffs and the defendant in error was not dissolved; and that the defendant in error was entitled to receive his salary during its continuance. For these reasons, my opinion is, that the judgment of the supreme court ought to be affirmed.
Coldeh, Senator.
The questions which this case presents, it seems to me, are, first, whether, under the agreement between the parties, which has been denominated the call of the defendant in error, there is a condition precedent which he was to perform before he could be entitled *to demand his salary ; and secondly, if there be such a condition, what is it ?
The questions,
The terms of the call, so far as it relates, in my opinion, to these questions, are as follows: “ To encourage you in discharge of the duties in your important office, we promise, in the name of this church, all proper attention, love and obedience in the Lord; and to free you from worldly cares and avocations whilst you are dispensing spiritual blessings to us, we, the ministers, &c., of the said church, do promise and oblige ourselves and our successors, to pay. to you the sum of 1500 dollars yearly and every year, in quarterly payments, as long as you continue our minister in the said church, and remain unmarried.” There is then a provision for an increase of salary in case of marriage.
Tho call
I cannot doubt but that these terms form a condition precedent; that is to say, the defendant in error was bound to fulfill the agreement on his part, or was bound to fulfill it so far as he might be permitted to do so by the other party, before he could demand a performance of the agreement on the part of the plaintiffs in error. [1]
contained a cedent.011 PI8
*525 But this presents the second and most important question ; what is this condition precedent? In my opinion, it is that the defendant inerror should continue to be minister in the church.
*525-1 I cannot construe the agreement between the parties to mean, that before he could claim his salary in a civil tribunal, it would be incumbent on him to show, and to prove that he had fulfilled- all the hopes and expectations of those who gave the call, and which are expressed in the instrument set forth in the pleadings. No doubt a confidence tiiat the defendant’s labors in -the gospel would be attended with a blessing, that he would preach the word in truth and faithfulness, that he would administer the holy sacraments agreeably to the institutions of Christ, and fulfill the whole work of the gospel ministry agreeably to the-word ofG-od and to the rules and constitution of the Dutch Church, induced the plaintifis in error to select *the defendant as their minister; but I cannot think that these expectations formed -any part of a condition precedent The terms of the instrument do not, in my judgment,,admit such a construction. All these Tropes and expectations are -introduced -in the instrument as reciting the inducement to the agreement between the parties; 'but form-no part of the legal obligation of the *526 defendant. I mean by legal obligation, such an obligation as he must prove performed before he can be entitled to recover his salary in a court of law. If he were before an ecclesiastical tribunal, and the question were as to the fitness of the defendant m error to continue the minister or the church, then unquestionably every word of these recitals would be entitled to consideration.
I not only think that if this agreement be construed in reference to its terms only, no other interpretation can be given to it; but it seems to me that a regard to the situation and objects of the parties, and a due respect to those principles of our institutions which require us forever'to keep separate ecclesiastical and civil jurisdictions, require that such an interpretation should be given to the instrument under consideration, as will preclude from our courts of law the polemic discussions which mnst necessarily arise in our civil courts, if they were to take upon themselves to decide whether the word had been preached in truth and faithfulness, whether the sacraments had been admin istered according to the institutions of Christ, and whether the work of the gospel ministry had been fulfilled agreeably to the word of God. These are questions not fit for a lay tribunal, and it seems to me the call reserves them for proper ecclesiastical judicatories.
The call purports that the defendant in error is to accept it in subordination to the rules and constitution of the Reformed Dutch Church as established in the synod of Dordrecht, as ratified and explained by the ecclesiastical judicatory of the Reformed Dutch Church of the city of Albany. The rules and constitution here referred to, are Presente^ by the case; and by these it appears that in the Dutch Church there are four ecclesiastical assemblies or *judicatories; that is to say, consistories, classes, particular synods, and general synods; that these rank in the order in which they are named, and that an appeal lies from an inferior to a higher assembly. By the 79th and 80th articles of the ordinances of Dordrecht, if a minister is guilty of the offence of habitual drunkenness, he is to be suspended by the consistory, and it shall be left to the de *527 cisión of the classis, whether he shall be wholly deposed or not. By the 89th explanatory article, the classes are J r _ . t> 1 invested with the power of deposing ministers. By the 72d explanatory article, the consistories are allowed to suspend ministers guilty of atrocious crimes from the exercise of their office: but the proceedings of a consistory in such cases, is not to be considered as a trial, but only as a prudent interference and binding over the person accused to the judgment of his peers, who are the members of the classis.
*526 Rules and fte8churehn °f
*527 These citations from the rules and constitutions of the church, show very manifestly, in my opinion, that the ecclesiastical judicatories had a right to suspend the defendant, or to depose him; and that so, whenever they thought he was unworthy of being a minister, they might annul all his claims to compensation; or, in other words, they might determine that he should cease to be the minister of the church. The question then is, have they done this, and when did they do it ?
On the 5th day of September, 1820, the consistory, without, as it appears, suspending their minister, as they have done by the 79th article of the synod of Dordrecht, made a representation to the classis of Albany of his evil habits, and intreated that the classis would proceed according to the rules of the church. On the 2d of December, 1820, the classis declared the defendant in error guilty, and pronounced a sentence, that he should be suspended from the office of the ministry, until “ he should give the classis evidence of repentance and reformation.” From this sentence the minister appealed to the particular synod of Albany, which, on the 16th May, 1821, decided that the appeal should not be sustained. From this decision the *plaintiff appealed to the general synod, which, on the 14th of June, 1821, affirmed the decision of the particular synod, and passed a resolution advising the classis of Albany to proceed to dissolve the pastoral connection between the plaintiff in error and the congregation of the Dutch Church in Albany. On the 26th of June, 1821, the classis of Albany, pursuant to the advice of the general synod, decided *528 that the connection should be dissolved, and did thereby, -as they resolved, 'dissolve the saíne. It would- appear that _ . ', , ^ . . . . L l . , n the question-as to the connection of the minister with the church, was finally decided by these proceedings. -But it would seém from the case, that ‘contemporary with the proceedings .on the first representation of the consistory ’of the 5th of •September, 1-820, which 'did -not require that Mr. Bradford-should be removed, bu’t.only that the classis Would take such measures as the rules Of the church and the nature of the case required, there were other proceedings against him, on a petition of the elders and-deacons, which is -recited in the resolution of the -classis "-Of Albany Of the -22d of February, 1821, which petition, it is stated, ■p’rayed for a-dissolution of the pastoral connection. ■ The ■last mentioned resolution recites, that Mr. Bradford -had -been regularly .tried .by the classis, and found (guilty of -inebriety ; and therefore the classis, On that day, '(that is, •22d of February, 1821,) resolved that the petition of the elders and deacons should be granted, and that the pastoral connection should be, and the same was thereby ‘de-Olared to be dissolved.
*527 Proceedings them’
*528 ■From this resolution of the Classis Mr. Bradford appealed to the particular synod, Which appeal was not sustained, and the same fesolutidn was confirmed according-to ’the resolution of the 21st -of May, 182-1, Which -is'referred-to -as before set forth; -but -there -is -no such resolution appearing in the case.; probably -the-resolution-of the 16th of May, ■1821, is intended.
From -this -resolution of the particular -synod, - Mr.' Bradford appealed to the general - synod. On the- saíne day that it is stated they decided not tb sustain the former appeal and to affirm -the decision ■ of the particular synod, *that is, on the -14th of June, 1821, the .general syriod is represented to have determined to ‘sustain the second appeal of Mr. Bradford, -as to the dissolution of the pastoral connection, and'-on the same day to have resolved that the classis should be advised to dissolve the connection between Mr. Bradford and his church. It is-stated in the case,"that in .pursuance of this -recommendatory resolution, -the clas* *529 gig, on the 26th of June, 1821, (the same day on which a resolution in the same words is stated to have been passed,) again resolved that the pastoral connection between Mr. Bradford and the church was thereby dissolved.
There appears to me to be inconsistencies and incongruities in these resolutions and dates, which I have in vain endeavored to reconcile. It is> very questionable, in my mind, whether the proceedings have been according to the rules and constitution of the church; but be that as it may, I feel well satisfied that the connection between Mr. Bradford and the church existed until it was dissolved, if it ever was duly dissolved, by the particular synod, on the 27th of June, 1821. This seems to be admitted; and if it was, then till that time Mr. Bradford was the minister of the church, and was entitled to his salary for as long as he continued to be so.
I do not find any difficulty in reconciling this opinion with any case which has been cited, or which I have met with. In Martin v. Hinde, all which relates to the present case, went on the ground that the curate was never qualified to take upon himself the office; and so, if Mr. Bradford had been disqualified, and could never have been minister of the church, the precedent condition would have failed, and he could never have claimed any salary. In the case of The Religious Society of Whitestown, the agreement of the defendant was to pay so long as the pastor should administer the gospel in the society, and was not, as in this case, to pay so long as the clergyman should continue minister of the church. The judgment in the case of The Church of Canajoharie, appears to me to support the opinion I entertain, that the connection ^between a minister and his church can only be dissolved by the proper ecclesiastical tribunals; for, in that case, it was decided that testimony to show that the clergyman was not entitled to his pay because he was a man of immoral conduct, and guilty of drunkenness and profanity, was properly excluded by the inferior court before which the cause was tried. I should very unwillingly assent to a decision of this court, which should establish that our temporal tribunals were *530 *° exa™ne aQd decide whether a pastor had preached the wor<^ ™ trudi and faithfulness, and whether he had fulfilled the whole work of the gospel ministry. Should our ^a7 courts assume jurisdiction of these questions, I think they would be going beyond their province; and that the ministers of the gospel, and the members of those holy offices might say to us, “ Promt, 0 procul, este projfam”
*529 Martin v. Hinde, Cowp. 437.
7 John. Rep. 115.
20 John. R. 12.
*530 In my opinion, the judgment of the supreme court must be affirmed.
Spencer, Senator.-
This cause depends on the construction of the covenant of the plaintiffs in error, by which they engaged to pay the defendant in error a certain salary as long as he “ continued their minister in the said church,7' and “ during the continuance of his ministry in the said church." By a resolution of the classis of Albany on the 2d of December, 1820, the defendant was “ suspended from the-office of the ministry, until he shall give the classis evidence of repentance and reformation.” The question is, did this sentence remove him from the ministry in the church ? To determine it, let us suppose that he had given the classis evidence of repentance and reformation, within two or three months after the sentence, and the suspension had been withdrawn; would any one have ever entertained a doubt, that during that period he had continued a minister in the church ? The very fact that the same classis, afterwards, on the 26th of June, 1821, did “ dissolve the pastoral connection” between the defendant and the church, is in itself an admission and conclusive proof, that up to that time the pastoral connection was not dissolved. This appears to me a *very plain view of the case, and excludes the considerations which have been urged respecting the defendant’s having disqualified himself. The plaintiffs m error have' not provided in their covenant for any such event. They have made the only condition of his receiving his salary, the fact of his continuing a minister in the church: and where the parties have themselves thus prescribed the terms on which the salary was to be paid, it seems to me that it would be making a new contract for *531 them to insist on any other conditions. Besides, if it were . . , . . . admitted that it was a condition precedent, that the de- „ , . , ,. , 1 . • • n , fendant in error should be, and continue m all respects qualified to officiate as a minister, it seems to me that the evidence proves he was1 qualified, until he was actually removed. Both parties submitted to the decision of the classis, and that body became arbitrators between them. When those arbitrators, by way of punishment, directed the suspension of the defendant, did they mean to say he was totally disqualified from serving as a minister ? If they had so intended, if they themselves thought so, the plain and obvious dictate of duty required them at once to dissolve the pastoral connection. Their omission to do so is in itself evidence that he was not disqualified, at least in the absence of any other proof; and there is no proof whatever in the case, of any disqualification, but the proceedings of the classis. It seems to me wholly immaterial what the reasons and causes of that suspension were. It is enough that the competent authority did not deem them sufficient to amount to a total disqualification.
Even in the most broad and extended view which could be taken, suspension from 'office cannot deprive the incumbent of the stipulated compensation during such suspension. By the constitution of this state, whenever an impeachment is prosecuted against the chancellor or any justice of the supreme court, the person so impeached is suspended from exercising his office until his acquittal. In the event of an acquittal, no one would doubt that the person impeached would b.e entitled to receive his salary for the time while suspended. The result cannot affect the *question of right. It must be the same, whether the party be acquitted or convicted; and such is believed to be the uniform practice in cases arising in the military and naval service of the United States. An arrest suspends the officer, but I cannot learn that his right to receive his pay up to the time óf sentence, was ever questioned.
In enumerating the causes which make a church in England void, and deprive a rector of the right to his tithes, baron Comyn does not allude to the suspension of the *532 minister in the course of ecclesiastical dicipline as such a cause* Bui it is sufficient ground for affirming the decision of the supreme court, that by the contract itself, the salary was to be paid .so long as the defendant in error continued a minister in the church, and that by the acts of the plaintiffs in error, of the classis, and of the other church authorities, he was recognised and admitted tó be a minister in the church until his connection was dissolved; and I ám, therefore, for affirming the judgment.
Ceary, Senator..
The ecclesiastical tribunals have disj solved the connection between the plaintiffs and defendant in error as pastor and people ; but, after the defendant in error was suspended from the office of the ministry, and pending the proceedings which resulted in dissolving the pastoral Connection between him and the Reformed Protestant Dutch Church in the city of Albany, salary accruan<I is claimed, and the question is upon the right to recover it.
Connection dissolved.
Salary claimed euspension*8 tSn
By the call, which is the covenant between the parties, the plaintiffs in error promised to pay the salary to the defendant in error during the continuance of his ministry in their church; and although the right to salary must depend upon the covenant between the parties; yet as that limits the salary to the continuance of the defendant in error as the minister of the plaintiffs in error, it is material to consider who has been the causé of suspending and finally terminating that connections The only evidence upon that subject is to be found in the proceedings of the different edclesiastiéal tribunals in which the plaintiffs and defendant in error have appeared, as parties. Hence the ^nature and character of thosé tribunals, and the effect of their'proceedings, deserve consideration.
Call.
It is part of the original compact among men, that they w¡¡¡ submit to the rulés and regulations of the society to which they belong. According to the constitution and laws of this state, we have no established religion; but by that constitution and those laws, every religious denomination is tolerated. This toleration must imply not *533 only the liberty of the- citizen to join any denomination, but the protection of that denomination in the of its chureh. Hence it folows,- that questions arising between- pastor and, people .must principally depend upon the regulations adopted for the- government of each particular church and denomination. These tribunals may be: considered as the choice of those- subjected to-their jurisdiction ; and when the parties appear and litigate before them, common law courts áre bound to respect their pro-9 1 1 eeedingsi
*532 Our social compact pro-church in its Smut S°V6rn"
*533 courts t0 re. sPect their proceedings.
From these- proceedings, it appears that at a consistorial meeting held on the 5th day of September, 1820; plaintiffs in error made a representation, in, writing to the-reverend classis of Albany, stating, “ That reports had existed for a considerable time past imputing to the defendant in error, their minister, repeated instances of inebriety ; that feeling unwilling to credit such reports, and desirous of preserving the character and usefulness of their minister, whose talents they held in the highest estimation, the elders had both 'formally and informally communicated the prevalence of said reports to- him, and admonished him in a. friendly manner of their ruinous tendency, and the necessity of greater circumspection on his part, to silence them; that hoping such communications and admonitions would produce a circumspect and exemplary course of conduct on the part of their minister, and aware of the injurious consequences which might result from a public investigation, the elders and deacons had hitherto forborne to request such investigation ; that the continuation and extensive prevalence of the said reports, with ■^references to recent "instances of the inebriety of their minister, as well as a deep sense of their Christian obligations, the rules of the church then constrained the elders and deacons to the painful duty of soliciting- the investigation as early as might be practicable; that the standing and usefulness of their minister in the congregation, was already materially impaired, and the elders and deacons entertained strong .apprehensions that .unless the said reporto should be speedily silenced by the judicial determi *534 nation of the reverend classis, and the reproach cast upon the character of their minister completely removed, it would be wholly impracticable to re-establish his usefulness amongst his present flock. Wherefore the elders and deacons earnestly entreated the reverend ' classis to take such measures touching the premises as the excellent constitution and rules of the Reformed Protestant Dutch Church prescribed, and the nature of the case imperiously requiredthat the said representation was, by the direction of the said consistorial meeting, signed, and on the 7th day of September, 1820, delivered to the president of the classis, and a copy served on the defendant in error; that a meeting of the classis was regularly convened and held, to investigate the truth of, and decide upon the matters set forth in the said representation ; that the defendant in error appeared, and the said' representation was openly and distinctly read to him in the said classis; that he alleged and objected that the said classis was not constitutionally convened, which objection was overruled; that the classis then proceeded to investigate whether the reports set forth in the said representation against him, of repeated instances of inebriety, Were of such continuance, and extent as to constitute what'is called “ common fame" and he attended such investigation, and had leave to cross-examine the witnesses; that after several witnesses Bad been duly sworn and examined before the said classis relative to the continuance and extent of said reports, and the evidences of the said witnesses had been duly considered, the said classis then and there adjudged and determined that the continuance and extent of the said reports against *the defendant in error, charging him with inebriety, were of such a nature as constituted what, in the constitution of the aforesaid church, is termed “ common famethat the said classis thereupon required the said consistory, by their special delegates appointed to attend the said classis, to furnish the said classis with specific instances or charges of inebriety against the defendant in error, and the names of witnesses to prove the same: that such specific instances or charges, and the names of divers witnesses to prove *535 the same, were thereupon furnished to the said classis. 1 x e' which were then and there openly read in the said classis , . r J . to the defendant m error; that the defendant m error, on being called upon by the classis to answer to the said charges, then and there denied the truth of the same, and thereupon requested time of the said classis to prepare for his defense, which was granted to him by the said classis until the 23d day of October then next, and the said classis adjourned to meet again on that day; that the said classis met, pursuant to adjournment, and then and there proceeded from day to day to investigate the truth of the said instances of inebriety of the defendant in error, and to hear the proofs and allegations in support thereof, until the 3d day of November, and on that day, at the special instance and request of the defendant in error, adjourned to meet on the 27th day of that month, and on the last mentioned day proceeded to hear as well the proofs and allegations of the defendant in error in his defense, as the further proofs and allegations of the said consistory touching the said instances of his inebriety, and continued such hearing from day to day, until the 2d day of December, when, after duly considering all the said proofs and allegations, the said classis pronounced the following decision thereon, that is to say: “Resolved, that the Rev. Dr. John M. Bradford be, and he is hereby pronounced guilty of repeated instances of inebriety and intoxication. Whereas sobriety in ministers is essentially connected with the honor of religion and success of the gospel; and whereas the Rev. Dr. John M: Bradford has been found guilty of repeated instances of inebriety or intoxication; therefore, resolved, that the said Dr. John M. Bradford be, and hereby is, suspended from the office of the ministry, until h„e shall give the classes evidence of repentance and reformation.” The defendant in error appealed from this decision and sentence of the classis to another ecclesiastical tribunal, the particular synod, where the decision and sentence of the classis was affirmed; when the defendant in error again appealed to the general synod, the highest ecclesiastical tribunal, where the decision and sentence of *536 the. classis, was also- affirmed ;• and the general synod- at th . , ' , . . . . , , time passed,- a' resolution advising the classis to, pro- , , .. . . ' * ' ceed. to dissolve the pastoral connection between the con,gregation of the Reformed Protestant, Dutch. Church, in, the city of Albany and the defendant, in error,, which yeasi, afterwards done,'
*533 what they are thia caae-
*536 The argument for the defendant in error ís¡ founded upon a supposition that the. defense, involves the decision, 0f a moral question, depending upon the different habits. and opinions of men.;: and if the conduct of the defendant, in error is censurable,, yet cognizance cannot be taken of it on any principle, known to. the. common law. "With a view to meet this.'1 argument, the. proceedings of the different, ecclesiastical tribunals, have been detailed;, exhibiting a standard of morality by which he has, agreed to he governed, and by which he ought, to be bound; and if it is not practicable to- afford complete, redress to the, plaintiffs in error* no difficulty is perceived in doing it,, so far as defeating the defendant in error in the present - suit will have that effect. Anything that is lawful may b,e. the subject of a contract, and any persons,, body politic or corporate,, may be parties to it, if capable of contracting. In the present case, the lawfulness of the subject and competency of the parties are not questioned. The only difficulty arises on the meaning of the contract. The call is according to the prescribed- form; and if the defendant, in error can re- . • T . cover m the present case, i can see, nothing to. prevent a recovery after accepting the call, in any case, and without eyer performing a single pastoral duty. By accepting the call, he-becomes the minister, and, according to the decisfon of‘ *the supreme, court, so long as that appellation can be applied to him, he is entitled to. his salary, • The consequence is, the plaintiffs, in error are deprived of all- the benefits they intended, to secure by the call, and the ‘defendant in error excused from all the duties he expected to perform. Thus, the incumbent is pensioned upon the congregation; and although he. does not perform pastoral duties, prevents the call and settlement of another, who might otherwise be, employed to perform them. The coy *537 énant in this case is uncommonly clear and perspicuous in its terms, and unquestionable in its object. If the subject matter had not thrown over it a kind of sacredness, if it had been a business of ordinary concern, and placed upon the footing of other contracts, it is believed that neither •counsel nor court would have entertained any doubt respecting its meaning. If parties will bring before courts of 'common law jurisdiction, questions out of the ordinary -‘course, such as it might seem should be preserved from -the-rude touch "of profanity, the principles which govern in other cases must be applied.
*536 Argumentthat question, answered.
Construction of the contract.
*537 To the jurist and civilian, one of 'the most obvious and familiar rules in the" construction of contracts is, that it ' shall be according to the intention of the parties. In the present case, the call which is the covenant, "commences by reciting that “ Whereas the Reformed Protestant Dutch Church in the city of Albany is at present, destitute of the stated preaching of the word, -and the regular administration of the ordinances, and is desirous of obtaining .the means of grace, which God hath appointed for the salvation of sinners, through Jesus Christ -his "son ; and whereas the said church is well-satisfied of’the piety, gifts and qualifications of you, John Melancthon Bradford, -and hath good hope that your labor in the gospel will be attended with a blessing: - therefore, we, the 'minister, elders and deacons of the said church have resolved to call, and we -hereby Solemnly, and in the fear'of the Lord, do call you, the said John Melancthon Bradford, to be our pastor and teacher, to preach the word in truth and faithfulness, and to administer the holy sacraments agreeably to *the institutions of Christ, to maintain Christian discipline, to edify the congregation, and ¿especially the youth, by catechetical instructions, and as a faithful servant of Jesus Christ, to fulfill the whole Work of the gospel ministry agreeably to the word of God, and the excellent rules and constitution of our Reformed Dutch Church, established in the last national synod, held at Dordrecht, and ratified and explained by the ecclesiastical judicatory under which we-stand, and to which you, *538 upon accepting this call, must, with us, remain subordinate.”
*537 It must be according to the intention of the parties.
*538 Ordinary covenants contain only the stipulations of the parties. By the recital in the one under consideration, the object is distinctly declared. The destitute condition of the church is stated, the' desire of the church to remain no longer in that condition, and the confidence of the church in the qualifications of the defendant in error to satisfy that desire. The call then proceeds: “ To encourage you in the discharge of the duties in your important office, we promise, in the name of this church, all proper attention, love and obedience in the Lord; and to free you from worldly avocations, whilst you are dispensing spiritual blessing to us, we, the minister, elders and deacons of the said church, do-promise and oblige ourselves and our successors to pay to you the sum of $1500 yearly and every year, in quarterly payments, as long as you continue our minister in the said churchevidently showing the paramount object to be, the important duties of the ministry, and the salary as a subordinate consideration with the defendant, as well as the plaintiffs in error. The salary is not promised for the preaching only, but as an encouragement. The call provides for the preaching, but at the same time supposes an exalted devotion, that would be degraded by the promise of salary, as the only inducement. On what principle, then, either of law or reason, can the plaintiffs in error be required to pay, when the defendant has disqualified himself from the performance of every pastoral duty, and deprived them of. every benefit contemplated by the call?
Another view of the subject is naturally suggested. The call enumerates the various obligations which the defendant fin error came under by accepting it; and, among others, is that of remaining subordinate to the rules and constitution of the Beformed Dutch Church. By virtue of those rules and that constitution, the defendant in error was suspended from the office of the ministry, until he should give “evidence of repentance and reformation;” which, not being done, the pastoral connection subisting between him *539 and the congregation of the Reformed Protestant Dutch Church in the city of Albany, was dissolved, and this suit is for salary which accrued between the suspension and dissolution. It is not pretended that any salary has accrued since the dissolution, and I cannot perceive any principle on which salary would have accrued after the suspension; for the sentence of dissolution must have" related back to the suspension; consequently, the defendant never was the minister of the plaintiffs in error after that time.
The sentence of dissolution related back to the suspension.
Yiele, Senator.
The question in this case is, whether Mr. Bradford shall be allowed his salary from the time of suspension to that of dissolution by the ecclesiastical judicatory.
I agree with the gentleman from the first district, (Mr. „ ... ' Colden,) that the performance was a condition precedent to the payment of the salary; and, to my mind, there is very little difficulty in saying how far the defendant in error must show that he has performed. He has submitted himself to the ecclesiastical judicatories. The parties have chosen the arbitrators to decide between them; and must ' both be bound by the decision, as to all matters of faith and practice. These judicatories are the only tribunals which can act in those matters; and we are bound to presume that all on the part of the minister has been performed, till they have passed upon his conduct; and whether their decision be for or against him, it is conclusive. The condition is the performance of the ministerial duties. A court of law is shut out from all inquiry as to the morals or of the minister. This belongs to the other judicatories; and the inquiry has been there instituted, and Mr. Bradford’s failure in an essential condition of the contract has been pronounced and confirmed. If my view of this subject be correct, we are presented with an adjudicated failure of performance, by judges of the parties!, own choosing; and the compensation, of course, fails with it.
Performance was a condition precedent.
bound’by the decision °f tlie Gcclesiastipal judicatories,
The condition ance^miaisduties,
It is said, however, that performance of pastoral duty is not the question, but. that it is Mr. Bradford’s continuance as minister ; and that the salary must be paid during such *540 continuance and during his suspension. 'I do not undei* stand the contract so. The language is, '“ during the continuance of your ministry in the said church.” How "is it PGssi^e ^e could continue such minister, while he -stood suspended "from the office of the ministry, -and‘that,-too, in Consequence of his own wilful misconduct"?
*539 Gout [anQt (
*540 But "the argument is, "that "he Still continued a minister, "that "is to say, he continued- so during'his suspension, with the Dutch "Church generally. It was the "same thing after the connection with the plaintiffs in error was dissolved. It is also true, "that the suspension did not dissolve the pastoral connection,- but the contract does-not refer-‘to this, any more than to the minister’s continuance in the "Dutch Church generally. His continuance in the ministry of the "particular church, by which "he had been called, was the object. Though his general -relation to 'the Dutch Church might continue, and his pastoral relation with the particular church, yet his ministry’to the latter could not be said "to continue, without his performing, or -at least being able and qualified to perform," the ordinary'duties-of a clergyman, "The pastoral relation had a 'technical con"tinuance, but nothing more. Had this not been finally dissolved, he would have returned to the particular church without any call; but during his suspension, he had no more connection with that church 'than with .any other. The ministry was his performing, or béing able to perform all the ministerial duties. It. is ntit material "to "inquire whether any provision is made by the rules and conStitu.tión of the church, 'for maintenance to the minister during •a state of temporary "disability. "This would doubtless be a matter of discretion, during a temporary .^suspension or disability, without the minister’s fault. But in no case, -"it appears to me, While suspended "from'his office, can he be said to continue in his office.
My opinion is, that the judgment of the couri."below should be reversed.
Stebbesfs, Senator.
The defendant‘in-eryor on the’2d 0f December, 1820, "was'“ suspended from'the office of the *541 the ministry/' by the clássis of Albany, for misconduct, and formally deposed on the 26th of June, 1821. His salary between those dates is the subject of controversy in this
*540 ¡■Subject óf controversy.
*541 By accepting the call set forth in the case, the defendant in error became bound to perform the services therein required of him, and became subject to the rules andconstitution of the Reformed Dutch Church, also mentioned in the nail, But admitting the defendant in error tb have been bound to perform the services designated in the call, it is ■contended that those services are not a condition precedent to the payment of the salary, inasmuch as the plaintiffs in error covenanted to pay as long as the defendant in error continued their minister.
t^fefendant in error,
The good sense of the contract appears to me to be a covenant on the part of the plaintiffs in error to pay the salary as long as the defendant in error continued . . .. .. . , minister, dispensing the spiritual blessings mentioned m the call; for the inducement of the contract to pay salary is stated in the call to be, “ to free him from worldly cares and avocations” whilst dispensing those blessings. If such is the sound construction of the contract, it amounts to a condition precedent, without the performance of which the defendant was not entitled to his salary. The case of Martyn v. Hinde, (Cowp 437,) has been properly relied on as fortifying this construction.
Covenant ¡a 33 Pth&Tefend^ in. error was minister in fact.
Marlyn v. Hinde, Cowp. 437.
In Thorp v. Thorp, (12 Mod. 460,) lord Holt says, “ Where one promise is the consideration of the other, and where the performance and not the promise is it, is to be gathered from the words and nature of the argument, and depends entirely thereuponand for the purpose of *reconciling a variance in the books, he puts the following case: “ If A covenant with B to serve him for a year, and B covenant with A to pay him ten pounds, there A shall maintain an action before any service; but if B had covenanted to pay ten pounds for the said service, there A could not maintain an action for the money before the service performed.
Thorp v. Thorp, 12 Mod. 460.
In looking at the call in this case, it is quite, apparent to *542 me that the plaintiffs in error considered the defendant’s performance oi the ministerial duties as the consideration of their covenant, and not his promise of performance. Indeed, they do not even require him to execute the covenant containing such promise. The language of the instrument is, “ We call you to perform the ministerial duties in our church; and to free you from worldly cares whilst dispensing spiritual blessings, we engage to pay you.” What else can it mean than a payment for those services as distinguished from an unconditional promise, according to the distinction taken by lord Holt ?
But if the instrument is to be regarded as containing mutual covenants, the cases of Boone v. Eyre, (1 H. Bl. 273 note a,) and The Duke of St. Albans v. Shore, (1 H. Bl. 270,) are authorities to show that a covenant which goes to the wk0ie consideration, is to be construed as a condition precedent.
Boone v. Eyre, and Duke of St. Albans v. Shore, 1 H. Bl. 273, 270.
How the contract of the defendant in error was, to dispense spiritual blessings in the manner mentioned in the call; and the sentence of the classis of Albany of the 2d of December, 1820, suspended him “ from the office of the ministry,” and hereby incapacitated him from exercising the ministerial functions.
This sentence, as is remarked by the chief justice, is equivalent to a refusal on his part to act, so far as he was . j . „ . incapacitated to act by the sentence; and a refusal to exercise the office of the ministry is a breach of the contract going to the whole consideration.
Sentence of suspensionwas equivalent to refusal to act.
I think the judgment of the supreme court ought to be reversed.
*Allen, Burt, Earll, Ellsworth, Hart, Jordan, Keyes, Livingston, McCall, McIntyre, Helson, Smith, Wooster and Wright, Senators, concurred.
For affirmance—Gardiner, Haight, Lake, Mallory, Ogden and Wilkeson, Senators.
Judgment reversed.

 Mutual covenants are divided into those which are dependent, and those which are independent. Wherever the money is to be paid, and the act done at the same time, the covenants are dependent, and neither party *525 can sue without averring performance, or offer of- performance, on his part; an<J'soi if John.covenants with James to split 6000 rails, and James covenants that, on the said work being completed, he will pay John. 60 dollars, **ames’ covenant' is dependent, and the performance of the work by John is called a condition precedent, which, in an action for the fifty dollars, he must aver and prove performed, or at least an offer to perform, and that he was prevented a performance by some act or neglect of James. But if James had agreed to pay John the fifty dollars on the 10th of September, and John had agreed to have the 5000 rails split.on the 20th of September, the covenants are independent, and John can recover the fifty dollars, although he had not touched the work, and James must bring his cross action for a breach of John’s covenant: and it was once holden by the supreme court, that an agreement by James to pay any part of the purchase money before the work was done, as if, in the last case, he had agreed to pay twenty-five dollars on the 19th of September, and the residue when the work was completed, which was to be on a certain day expressed in the contract, rendered the covenants independent throughout, and gave John the same right to recover both instalments without touching the work, as he would have, if the whole was to be paid before the work done; but this doctrine is now exploded, and the covenant of James is holden to be independent as to the first instalment, but dependent as to the second—and the extent of the rule, as now- holden, is, “that ifj by the terms of the contract, the money is to be paid-by a day certain, and which is to happen before the performance of the service, or by a day certain, and there is no day certain for the performance, the performance is not a condition precedent.” The rule is, to construe covenants according to the meaning of the parties, and the good sense of the case. To ascertain the intention of the parties, the following general rules are deduced from adjudged cases by Savage, Oh. J., in delivering the opinion of the court in Tompkins v. Elliot, 6 Wen. 497. 1. If a day be appointed for the performance of any act, and such day is to happen or may happen before the performance of the act which is' the consideration for the first mentioned act; then the covenants are considered mutual and independent, and-an. action may be brought without averring performance of the- consideration; for it appears that the party relied upon his remedy, and did not intend to make the performance a condition precedent; and so it is when no time is fixed for the performance of the consideration. 2. But when the day appointed for the payment of money or performance of any act is to happen- after the thing which is the consideration is to be performed, no action can be maintained before the performance of the condition. 3. When a covenant goes only to part of the consideration on both sides; and a breach of such covenant may be paid for in damages, it is an independent covenant, and an action may be brought for a breach of the covenant by the defendant without averring per *525-1 formance; and where a person has received part of the consideration for which he entered into the agreement, it would be unjust that, because he has not had the whole, he should therefore he permitted to enjoy that part without either paying or doing anything for it; and, therefore, the law obliges him to perform the agreement, on his part, and leaves him to his remedy to recover damages for not receiving the whole consideration. 4. But when the mutunl covenants go to the whole, consideration op both sides, they are-mutual conditions and dependent. 5. Where two acts are to be don©at the same time, neither party can maintain an action without showing perform-ance or an offer to perform on his ¡part.
Where-a-party agreed, on the,payment by another of-certain, sums of money to a third person, to assign certain certificates of sale of land, it was held, that the covenants were independent, on the ground! that the performance Of the covenant to assign was naturally to be subsequent to the payment of the money. Where there are mutual covenants, and the defendant has received-the principal part of the-consideration for dhe engagement on his part, the covenants of the parties will b© eonstmied to be independent, and the plaintiff will be allowed to maintain an action for the breach of the defendant’s covenants, although he hasfaQed'in part- in performance on "liis side—it -was so-held, where a plaintiff transferred to the-d'efendantfiiis right to put in a crop of 90 acres of land to- be cleared-, by him,, although he failed in finishing the clearing and fencing the land- as fast-as the defendant regtiired-it for sowing, as he had engaged to. do by the articles of agreement» 1 Cowen’s Treatise, 2d ed., po. 44, 45.
*525 What it is.
Thatheshould continue minchurch111 *k0