GEORGE W. CONNITT et al. v. THE REFORMED PROTESTANT DUTCH CHURCH, OF NEW PROSPECT et al.

(GENERAL TERM, THIRD DEPARTMENT, JUNE, 1871.)

4 339,
82h 133

The relationship of pastor and people in the church known as "The Reformed Church, in America," is purely ecclesiastical. Its ecclesiastical tribunals alone have cognizance of it.

The contract between a particular church of this denomination, and the pastor, thereof, is conditional, and dependent upon the ecclesiastical relationship.

A contract between such a church and its minister, for the services of the latter, at a stipulated salary, based upon the fact of its subordination to the rules of church government, as established by the denomination, is subject to the ecclesiastical rule of the church; and a decree of the authorized church tribunal, dissolving the pastoral relation between the minister and his church, severs that relation, and annuls the contract of employment.

An appeal from a subordinate to a higher tribunal of the church, waives objection to the decree of the latter, for want of jurisdiction.

A written declination, signed by several members of the consistory, or board of church officers, publicly read in presence of the congregation, by which they decline to act further, as such officers, under the then present pastor of the church, succeeded by acts on the part of the remaining officers, of the authorities of the church, and of the officers declining, showing that the declination was not intended as a resignation, though the officers declining ceased to act, for the time, there being no act or conduct

on the part of the corporation, or any of its members, or authorities, accepting it as such, until after the pastor had ceased to be such, and the declining members had resumed their duties as officers, is not to be construed as a resignation. Subsequent action of the consistory, in which the declining members being a majority thereof, participated, is regular, and binding upon the church.

This case came before the court upon a case made and submitted, under section 372 of the Code.

The defendant, the Reformed Dutch Church, of New Prospect, located at Shawangunk, in Ulster county, was organized as a religious corporation under the laws of this State, and was attached to the Reformed Dutch Church (now Reformed Church) in America.

Each church of the denomination is, by the constitution of the denomination, under the control and management of a board of officers, consisting ordinarily of eight persons, being elders and deacons, and of the minister of the church, if any, and together constituting the consistory, or trustees, of the church.

The elders and deacons have each an equal voice in all that relates to the temporalities of the church, to the calling of a minister, and the choice of their own successors ; and a majority of the consistory constitutes a quorum for the transaction of business. The consistories have the right of calling ministers for their own congregation; but the call must, in all cases, before presentation to the minister, be approved by the classis,    a higher body of officers.

The constitution also provides that the ecclesiastical assemblies which shall be maintained in the Reformed Church are three in number : 1st, Consistorial; 2d, Classical; 3d, Synodical; that in these assemblies ecclesiastical matters only shall be transacted. The classis has the same jurisdiction over a consistory that a particular synod has over the classis, and a general over a particular synod. The classes have cognizance of whatever respects the welfare of their particular churches, for the management of which the consistory may be incompetent. It has, however, to approve or disapprove of calls to ministers, also of the ordaining, suspending and deposing of

them, or of dismissing them when called elsewhere. An individual, conceiving himself aggrieved by the decision of a lower judicatory, may appeal therefrom to the judgment of a higher judicatory. A classis consists of all the ministers and an elder designated from each consistory within the bounds prescribed by the particular synod.

The plaintiff Connitt was regularly called and settled as minister over the church of New Prospect, at an annual salary, together with use of the parsonage belonging to the church; the call was in the usual form used by the churches of the denomination, and set forth, substantially, that whereas the church was destitute of the preaching of the word and regular administration of the ordinances, and was well satisfied of the qualifications of George W. Connitt, therefore, the consistory of the Reformed Protestant Dutch Church of New Prospect had resolved to call, and hereby called the said G. W. C., to be pastor and teacher, &c., " to fulfill the whole work of the gospel ministry, agreeably to the word of God and the excellent rules and constitution of our Reformed Protestant Dutch Church, established in the last national synod held at Dordrecht, and ratified and explained by the ecclesiastical judicatory under which all stand, and to which you, in accepting this call, must, with us, remain subordinate." (For full form of the call in this case, see *Dutch Church of Albany* v. *Bradford*, 8 Cow., 459.)

In October, 1868, six of the eight members of consistory, with four other members of the church, presented a communication to the classis of Orange, to which the church of New Prospect was attached, praying that the pastoral relation between the plaintiff Connitt and the church might be dissolved; upon this petition, which presented, as grounds for the request, the embarrassed and divided condition of the church, a prevailing dissatisfaction therein, and suffering state of its temporal and spiritual welfare, and that the church could not longer be sustained under the pastoral care of the plaintiff Connitt. The classis took proceedings resulting ultimately in a resolution dissolving the pastoral relation,

as prayed by the petition, which resolution bore date May 3, 1869. From this resolution or decree Mr. Connitt appealed, and refused to withdraw from the church or suspend the exercise of his pastoral duties. New charges were prefered, involving his insubordination to the decrees of classis, and other acts alleged regarding his persistence in exercising the duties of the office of pastor in the church of New Prospect. Upon these charges he was tried by classis, and was suspended by resolution of September 29, 1869, from the exercise of the office of the ministry. From this resolution an appeal was also taken by Mr. Connitt, as well as from a resolution of classis requiring him to surrender the keys of the church, minutes of consistory, &c. The appeal from the resolution of May 3, 1869, was heard by the particular synod, and the action of the classis sustained thereby; and, upon a further appeal to the general synod, it was also sustained. The other appeals were withdrawn. The questions presented by the case are stated in the opinion of the court.

A stipulation was contained in the case, that judgment should be rendered against either or any of the parties, in conformity with the findings upon the questions presented, for the surrender of possession of the corporate property to the parties adjudged to be the consistory, and for a reference to settle amounts awarded, &c., &c.

*T. R. Westbrook*, for the plaintiff.

*M. Schoonmaker*, for the defendant.

Present—POTTER, P. J. PARKER and LEARNED, JJ.

By the Court—PARKER, J. The pastoral relation between plaintiff Connitt and defendant, the Reformed Protestant Dutch Church, of New Prospect, was dissolved by the classis of Orange, on the 3d day of May, 1869.

This action of the classis, upon appeal by Mr. Connitt, has been affirmed by the particular synod of New York, and the

general synod, which is the highest judicatory of the Reformed Church, in America.

Upon the question, "Is the Rev. George W. Connitt still the pastor of the church of New Prospect?" which is the first of those submitted to us, we must, I think, be governed by those decisions.

The relationship of pastor and people is, in the reformed church, purely ecclesiastical; and the ecclesiastical tribunals alone have cognizance of it. The civil contract is, necessarily, a conditional one, dependent upon the existence and continuance of the ecclesiastical relation.

In speaking of ecclesiastical tribunals, I do not. mean to imply the existence of any such tribunals, in the sense in which they are known to the English law, but merely existing judicatories, known to the several religious denominations in this country.

The church of New Prospect is attached to the religious denomination known as the "Reformed Church, in America," and is under the ecclesiastical order and government of said church. The call, pursuant to which Mr. Connitt became the pastor of the church of New Prospect, is based upon that fact; and the undertaking of the consistory of that church to pay him a salary of $800, per year, and allow him the use of the parsonage, so long as he shall " continue the minister of the church," is in subserviency to the ecclesiastical rule; and the continuance of the relationship between him and the church, is dependent upon the administration of such rule by the ecclesiastical judicatories. All this follows from the call itself, its acceptance, and the then existing relation of Mr. Connitt and the church of New Prospect to the Dutch reformed church, as organized in this country.

While the civil courts have jurisdiction over the civil contract, by which Mr. Connitt is entitled to his salary, and the use of the parsonage, they have no jurisdiction over the relation of pastor and people, and cannot lengthen or abridge its continuance.

We cannot fail to see, I think, that in this case the *pastoral relation* established between Mr. Connitt and the church of New Prospect, was as purely ecclesiastical as that in which he stood as minister in the Reformed Church, of America. His rights and duties as minister, and as pastor, were ecclesiastical, not civil; and the ecclesiastical tribunals of the Reformed Church, of America, alone could suspend or depose him from the ministry, or dissolve the relation which existed between him and the church, as pastor and people. His duties as minister, when placed over this church, were of a character peculiarly within the cognizance of the authorities of the church organization to which he belonged, and were to be performed in pursuance of the rules and usages of that organization; as minister and pastor he was amenable to no other organization; and such organization, through its different instrumentalities, consistories, classes, and synods, had entire control of both pastor and people in all ecclesiastical matters. The secular courts have no jurisdiction over the ecclesiastical rights of either pastor or people, and neither can resort to those courts for the protection or enforcement of such rights.

The fact that the civil contract is subsidiary to this relation, does not serve to bring this within the jurisdiction of the civil authorities. Nothing in the case of *Austin* v. *Searing* (16 N. Y. R., 112), relied upon by plaintiff, warrants the conclusion that it does. The doctrine of that case is, that the civil courts will not recognize the adjudications of voluntary associations, upon the *property rights* of the members of such associations.

Now, inasmuch as the relation in question is not a civil one, dependent upon municipal law, but wholly ecclesiastical, and wholly dependent upon ecclesiastical rule, and its administration, by the church judicatories, it is not for this court to review the decisions and judgments of such church judicatories. Over them, and the administration of their rules and usages, we have no jurisdiction. No civil right is infringed by them in dissolving the pastoral relation. Mr. Connitt has no right to the continuance of such relation, cognizable in

the civil courts, and, consequently, any wrong done him by the church courts, in its dissolution, is not one cognizable by the civil courts, either in an original or appellate proceeding. The rights to salary, &c., it is true, is, by contract, made dependent upon the continuance of the pastoral relation. But this does not bring such continuance within the cognizance of the civil courts. They can inquire only into the fact of the continuance. The relation is, nevertheless, controlled by the ecclesiastical authorities; and the fact of their dissolution of it is conclusive.

Upon principle, this view seems to me the only logical and correct one. As was wisely remarked in the opinion of the Supreme Court of Illinois, in the case of *Chase* v. *Cheney* (10 Am. Law Reg., 303, N. S.), delivered by THORNTON, J., " Our Constitution provides that the ' free exercise and enjoyment of religious professions and worship, without discrimination, shall forever be guaranteed.' * * * The Constitution intended to guarantee, from all interference by the State, not only each man's religious faith, but his membership in the church, and the rites and discipline which might be adopted. The only exception to uncontrolled liberty is, that acts of licentiousness shall not be excused, and practices inconsistent with the peace and safety of the State shall not be justified. Freedom of religious profession and worship cannot be maintained if the civil courts trench upon the domains of the church, construe its canons and rules, dictate its discipline, and regulate its trials. The larger portion of the Christian world has always recognized the truth of the declaration, ' a church without discipline must become, if not already, a church without religion.' It is as much a delusion to confer religious liberty without the right to make and enforce rules and canons, as to create a government with no power to punish offenders. * * * The civil courts will interfere with churches, or religious associations, when rights of property or civil rights are involved. But they will not reverse the decisions of associations upon ecclesiastical matters, merely to ascertain their jurisdiction." This view I regard as in entire

consonance with the current of authority on the subject in this State.

The case of *The Dutch Reformed Church of Albany* v. *Bradford* (8 Cow., 457), decided by the Court for the Correction of Errors of this State, fully sustains the view above taken.

In that case, Dr. Bradford, the pastor of the Dutch Reformed Church of Albany, sued for his salary. The defendant set up, in defence, his suspension from the ministry by the proper church judicatories; which defence was overruled by the Supreme Court, and the case was taken by writ of error to the Court for the Correction of Errors, where the judgment was reversed.

The suspension of Dr. Bradford, by the church judicatories, from the ministry, was held by the court of review, in that case, conclusive upon the civil courts. Senator CRARY, one of those voting for the reversal of the judgment of the Supreme Court, in delivering his opinion, says: "Questions arising between pastors and people must principally depend upon the regulations adopted for the government of each particular church and denomination. These tribunals may be considered as the choice of those subjected to their jurisdiction; and, when parties appear and litigate before them, common-law courts are bound to respect their proceedings."

In this view, both the majority and minority in that case concur. Chancellor JONES, who voted to affirm the judgment of the Supreme Court, in his opinion, said, in reference to the questions between the pastor and his people: "The matter could not be drawn into the courts of law, or made the subject of judicial cognizance. If the accused was guilty of the charge [drunkenness], his sentence was to be pronounced by the classis, and could only be reviewed by a higher judicatory. * * * Courts of law do not interfere with the discipline of the church, or the punishment of ministers, or the sentences of ecclesiastical authorities; and if the right of the defendant in error to the salary for which he sues has been lost to him, it must be the sentence of the classis which has

produced that effect, and the plaintiffs in error must rest upon that sentence alone for the support of their defence to the action at law." · The exclusive power of the church courts over the question decided by them, to wit, the suspension of Dr. Bradford from the exercise of his ministerial duties, was assumed by the parties and the members of the court; but whether such suspension, under the contract for the salary, which, as in the case at bar, was to continue as long as Dr. Bradford continued the minister of the church, deprived him thereof or not, was the subject on which the parties and members of the court differed; it being held by the majority that, by the suspension, he ceased, within the meaning of the contract, to be their minister.

It is said, on behalf of the plaintiff, that, in the case just cited, the minister was tried for an offence, and found guilty, while, in the case at bar, no offence is charged against the plaintiff. This difference does not, I think, affect the question under examination. In each case, the ecclesiastical tribunals having jurisdiction of the subject pronounced their judgment in respect to it. In each case the parties submitted themselves to the judgment of such tribunals. For, though it is said that, in the case at bar, there was no trial by the classis, and it had no jurisdiction of the person of the plaintiff, still, granting that there was no summoning of the plaintiff by the classis to a trial or hearing, yet, if there was any defect of personal jurisdiction in the classis, the plaintiff, by appealing to the particular and general synods, submitted himself to the jurisdiction of those courts, and their judgments are not void, but binding and conclusive upon him.

In *Robertson* v. *Bullions* (9 Barb., 64), defendant Bullions had been deposed by the presbytery, from the ministry, but, with the assent of the trustees of the society, and a large part of the church and congregation, still continued to officiate as pastor of the church, and to exclude other ministers sent by the presbytery to officiate in the church edifice. Plaintiffs filed a bill for relief, setting forth his deposition, and praying, among other things, that he might be restrained from officia-

ting as minister; and the trustees, from permitting him to do so in the church edifice, and from using the property of the society for his support.   He set up in his answer, that, although he was deposed by the presbytery, such presbytery was not legally constituted; that he was absent, and not legally notified; that the act was that of a minority.   Upon the subject of his deposition, the court say: " Much was said on the argument respecting the manner of his deposition from the ministry.   It is contended, among other things, that the act of the presbytery was irregular and void, not only because it was by a minority of the ministers composing it, a ministerial majority being necessary, but because the four clerical members remaining, after the votes of four others had been rejected, were the accusers of Dr. Bullions in the case.   It is also insisted that he could, and did protest against their authority and appeal, and thus suspend their powers.   *   *   *   * This argument, perhaps, under the peculiar circumstances of this case, would be apposite, were it not for the appeal to the synod, by Dr. Bullions himself, which was not sustained. *   *   *   *   I do not see how we can look beyond the decision of the synod.   *   *   *   *.  Dr. Bullions himself took the case to the synod; and the deposition of a minister is purely an ecclesiastical matter, though the effect of that deposition upon civil rights is quite another thing.   The church judicatories had power to depose him, but they could not sequester the property of the congregation.   *   *   *   * Our courts have, as we have seen, declared that such dissolution of the connection between pastor and flock, discharges the civil contract."   The result was, that by the decree granted, the defendants were restrained from using the temporalities of the corporation for the support of Dr. B.'s ministry, as long as he should be under sentence of deposition.   This judgment was subsequently affirmed by the Court of Appeals (1 Kern., 243).

The case of *Chase* v. *Cheney* (*supra*) fully sustains the view above taken.   A minority of the court in that case dissents from that portion of the opinion of the court, holding the

conclusiveness of the judgment of the ecclesiastical court upon ecclesiastical matters. But even the view of the minority would sustain the decision of the ecclesiastical courts in this case. "We concede," they say, " that when a spiritual court has once been organized in conformity with the rules of the denomination of which it forms a part, and where it has jurisdiction of the parties and the subject-matter, its subsequent action, in the administration of spiritual discipline, will not be reviewed by the secular courts." Although I am inclined to agree with the court in that case, that when no other right is involved than the clerical office, (or any other right merely ecclesiastical), the decision of the ecclesiastical court, even as to its own jurisdiction, under the canons of the association, is conclusive ; yet in the case at bar, as already intimated, the ecclesiastical courts, against whose judgments Mr. Connitt claimed to be pastor of the church of New Prospect, had undoubted jurisdiction, both of the subject-matter, and, so far as synods are concerned, of the parties ; and, I think, the learned counsel of the plaintiffs is in error, in insisting that there was, under the constitution of the church, a want of jurisdiction, because by the amendment of 1809, the right of the classis to dissolve the pastoral relation, on the ground of expediency, was taken away. The classis, nevertheless, had jurisdiction of the subject-matter, the pastoral relation, and its continuance or dissolution. If it erred in dissolving such relation, placing its judgment upon the ground that the good of the church required it, still it is not for this court to interfere with such judgment, and pronounce it invalid. The synods to which the plaintiff appealed, and to whose judgment he submitted himself, and the question at issue, having affirmed the judgment of the classis, I think, upon this question, such judgment is conclusive, both upon the parties and this court.

As to the first question submitted to us, then, I am of the opinion that Mr. Connitt is not the pastor of the church of New Prospect, and that he ceased to be such pastor on the

3d day of May, 1869, when the decree of the classis, dissolving the pastoral relation, was made.

To the second question, viz., "Is George W. Connitt entitled to any salary as pastor of said church since the 3d day of May, 1869, and, if so, to what date?" the answer follows, that he is not entitled to any salary since May 3, 1869.

The third question is, "Which of the parties are now the consistory of said church?"

This is a question of some doubt; but I am inclined to think that the individual defendants, David Parliman and the seven others who claim with him to be such consistory, are the legal consistory of the church.

Unless the action of the six members, who publicly refused to act as elders and deacons of the church under the then pastor, amounted to a resignation by them, and I think it did not, there can be no doubt that defendants are the true consistory. The paper signed by them and read publicly in church on the 24th of January, 1869, is as follows: "We, the undersigned, members of the consistory of the Reformed Church of New Prospect, under the existing troubles in our church, do decline, from this time forth, to act as elders and deacons under the present pastor."

This was not taken, either by the pastor, or the residue of the consistory, or the church, or the classis, to which the recusants were presented for discipline for their recusancy, as a resignation, but merely as a dereliction of duty. Manifestly, the recusants themselves did not regard it as a resignation, for, on the 20th of April following, they, as elders and deacons of the church, presented to the classis a statement or representation concerning the condition of the church, praying a dissolution of the relation between the pastor and people. There was also, in effect, an utter refusal to accept the resignation. The pastor sought the assistance of the classis to compel a quorum of the consistory to attend its meetings; and classis did reprehend that refusal to perform their official duties, and recommend to them their resumption. They did thereupon again enter upon the performance of their duties,

as members of the consistory; and it was not until several weeks later, and after the dissolution of the pastoral relation, that Mr. Connitt and one member of the consistory proceeded to declare the offices of those six members vacant, and to elect persons to fill enough of them to constitute a quorum.

This action of Mr. Connitt and one member of the consistory was, if I am correct in holding that there was no resignation by the six, wholly void. But, irrespective of that question, as Mr. C. was no longer pastor, and, therefore, no longer a member of the consistory, the action of the two was not the action of the consistory, and, therefore, was wholly nugatory and void. And in neither event are the plaintiffs the consistory.

As already remarked, there was no acceptance of the resignation. "To complete a resignation, it is necessary that the corporation manifest their acceptance of the offer to resign." (Angel & Ames on Cor., § 433.) This may be done either expressly or by implication. But, in this case, there is no express act of acceptance, and no act or conduct on the part of the consistory, or any member of it, or of the church, from which an acceptance can be implied. The whole course of all parties concerned is inconsistent with the idea of a resignation having been made, or of an acceptance of it, if made, until after Mr. Connitt had ceased to be the pastor, and after the recusants had resumed the performance of their duties as members of the consistory. I am of the opinion that no resignation occurred.

The subsequent filling up of the vacancies in the consistory by the said five members thereof, if they were in fact members, was regular, though Mr. Connitt was ignored as a member of the consistory, for he was no longer a member, and the persons so elected are regular and legal members of the consistory.

The subsequent call of the defendant, John T. Demarest, to be the pastor of the church, and his installation as such, it follows from the views above taken, was regular and effectual;

and he, with the other individual defendants, are the true and regular consistory of the church.

The fourth question submitted is, "from what time, if any, are the defendants, the New Prospect church, entitled to a reasonable rent or allowance for use and occupation of the parsonage and grounds attached thereto, by way of counter-claim against the demands of the said George W. Connitt?"

The consistory, at the time Mr. Connitt was paid his salary up to May 3d, 1869, granted him the use of the parsonage until the first of July then next, and required him, on or before that day, to vacate it. Since that time, the use of the parsonage belonged to the religious corporation, the Reformed Protestant Dutch Church, of New Prospect; and for such use, which Mr. Connitt has enjoyed, he should pay the corporation a reasonable rent or allowance.

It follows that, under the submission, a judgment should be entered, adjudging and declaring that the said George W. Connitt ceased on the 3d day of May, 1869, to be the pastor of the said church, and is not entitled to any salary as pastor of said church since that time; and that the judgments obtained by him against said corporation, which are for his salary as pastor of said church since that time, be satisfied and discharged of record. That the defendants, John T. Demarest, David Parliman, Daniel M. Schoonmaker, George W. Evans, Robert L. Thompson, David A. Decker, Levi V. Depuy, John Raymond, and Albert Schoonmaker, are the true and lawful consistory of said church. That the said corporation is entitled to recover of the said George W. Connitt, who is adjudged to pay to it, such sum for the use and occupation of the parsonage and grounds attached, belonging to said corporation, from July 1st, 1869, to February 7, 1871, as shall be found by a referee to be appointed by the court, to be reasonable therefor; and that the said Connitt, and other plaintiffs, respectively, surrender all the corporate property in his or their possession, or under his or their control, to the defendants, within one month after the entry of such judgment; and that neither party, as against the other, recover costs.

LEARNED, J., (dissenting.)  This is a case made under section 372 of the Code, without action.  It is intended to settle an unfortunate controversy and several actions which have arisen out of it.  The controversy, in brief, is this.  Who are the legal officers of the R. P. D. C., of New Prospect ; and who is the pastor ?  Many facts are spread out in the case, and much discussion was had in the argument, and some ecclesiastical questions raised.  But, of course, the only matters which come before the court for decision, are the civil rights of the parties.  As to ecclesiastical rights and duties, except so far as they affect civil rights and duties, the court has nothing to decide.  If in any way they affect civil rights and duties, then the matter is under the control of the court.

In the course of the argument, and in the discussions, which this controversy has occasioned, and which appear in the case, something has been said about ecclesiastical courts.  This phrase has no accurate meaning in this country, and its use is liable to mislead.

We have no ecclesiastical courts.  The language which is used in a part of the case about the interference of civil courts, with the prerogatives and actions of ecclesiastical judicatories, is incorrect in the principles which it implies.  There are no such judicatories except as any body of men may call itself a judicatory ; and there is no ecclesiastical sphere of authority in any other sense than there is a "Sons of Temperance" sphere of authority, or an "Odd Fellows" sphere of authority.

The bodies which are called classes, synods, presbyteries, general assemblies, conventions, and the like, are not courts, to name them so is to use language appropriate only to a State church.  Ordinarily, this assumption is harmless ; but in the discussion of a question like the present, the use of the word, court, implies an authority in these bodies, which they do not possess.  A court is established by law, and derives its authority from the State.  These ecclesiastical bodies in this country are not established by law, and have no authority from the State.  Whatever authority they pos-

sess, arises from the consent or contract of parties, and is not judicial. The maxim that causes spiritual must be judged by judges of the spirituality, and causes temporal by temporal judges, has no meaning in this State. For there are no judges of the spirituality. So long as any action of an ecclesiastical body, or of any other organization, does not affect civil rights, nothing can arise for the decision of a court. When it does, then the question will be decided by the courts; and there are no courts but the courts of the State.

The State confers no authority on any of the several ecclesiastical organizations within its limits. It authorizes, by a general act, the formation of religious corporations, composed severally of the members of a congregation. These are not ecclesiastical corporations, in the sense of the English law, but civil corporations, governed by the ordinary rules of the common-law. (*Robertson* v. *Bullions*, 11 N. Y., 243.) These corporations are often united together by some general organization. The rights, powers and duties which such a general organization may possess over the individual churches arise, not from legislative authority, but only from consent and agreement. It was said, in the course of the argument, that such powers are derived from the great head of the church. But powers so derived are not to be enforced by the State, unless distinctly recognized by its laws. The entire separation of church and State leaves the church, like other voluntary organizations, to the voluntary obedience of its members to the general laws of the land. (See the case of *Austin* v. *Searing*, 16 N. Y., 112.)

There is not, so far as I know, any law which invests ecclesiastical bodies, such as classes, presbyteries, conventions, and others, with any power over religious corporations. It is important to keep this principle in mind. For, since some of these organizations have come from countries where they are established by law, it is easy to assume that they bring with them the same legal authority which they had there. It was the intention of the legislature, says Judge SELDEN, in *Robertson* v. *Bullions* (*ut supra*), " to place the control of the

temporal affairs of these societies in the hands of a majority of the corporators, independent of priests or bishops, presbytery, synod, or other ecclesiastical judicatory." "We have," say the court, in *Smith* v. *Nelson* (18 Vt., 511), "no religious establishment, no ecclesiastical law or courts, established by any authority. All their laws are wanting in this essential requisite to give them any authority, that they are not prescribed by the *supreme power of the State.* And, although they may form constitutions, enact canons, laws or ordinances, establish courts, or make any decisions, decrees or judgments, yet they can have only a voluntary obedience, cannot affect civil rights, immunities or contracts, or alter or dissolve any relations or obligations arising from contract. When their proceedings are to be examined in the ordinary tribunals of justice, their power is a *phantom,* and they can receive no more consideration than the regulations of any other voluntary associations formed for trifling or for grave and important purposes."

The Reformed Protestant Dutch Church of New Prospect is a religious corporation, duly organized under the laws of the State. The officers of this corporation are the elders and deacons and the minister, when there is one. (Act to provide for the incorporation of religious societies, § 2.) That is, the same persons who, as the consistory, are selected to take care of the spiritual affairs of the people, are also the officers of this civil corporation. There are four elders and four deacons, whose term of office is two years, except when chosen to fill a vacancy occasioned by death, resignation, &c., and the consistory choose their successors. The persons chosen are published in the church for the approbation of the people, and they are ordained. The plaintiffs claim to be the consistory of this church, and the individual defendants make the same claim. If this were only a question as to an ecclesiastical office, probably the court would not consider the question. But, as the elders, deacons and minister are the officers of the corporation, a legal body, with civil rights, the question sub-

mitted is probably intended to be, Who are those officers? And this is proper for our decision.

On the 24th day of January, 1869, the officers of this corporation were : George W. Connitt, pastor; David Paliman, Daniel M. Schoonmaker, George W. Evans, Isaiah A. Whitter, elders; and Robert L. Thompson, Milton Terwilliger, Albert Schoonmaker, and John A. Niver, deacons. On that day, being Sunday, David Paliman presented and publicly read to the congregation of said church, assembled for public worship, a paper, signed, and in the words following, viz. :

" We, the undersigned, members of the consistory of the Reformed Church of New Prospect, under the existing troubles in our church, do decline, from this time forth, to act as elders and deacons under the present pastor. *Elders*— David Paliman, Dan'l M. Schoonmaker, George W. Evans. *Deacons*— Robert L. Thompson, William Terwilliger, Albert Schoonmaker."

From that time till (at least) the 12th of May, 1869, the persons whose names are signed, did not act, or pretend to act, as members of the consistory, and absented themselves from all meetings of that body. One of the most important questions in this case, perhaps the most important, is, as to the effect of this paper. Was it, or was it not, a resignation ? We are not aided in the decision of this question by the fact that, in the following May the classis of Orange recommended these persons to resume their duties. If they had not resigned, no such recommendation was necessary. If they had, it was utterly inoperative. The classis could not reinstate them in office, nor could they reinstate themselves. We must, therefore, come back to the transaction of January 24th.

There can be no doubt as to the power of a member of the consistory to resign. It is recognized in the constitution of the Dutch church (chap. 1, art. 3, sec. 5), if any recognition were necessary. The paper under consideration was a deliberate and formal instrument, signed by the parties. It was presented to the corporation, of which they were the officers, and by one of the signers was publicly read.

The trustees of a religious corporation (in this case the elders, deacons, and ministers) are the officers of the corporation, like the directors of a bank, or of a railroad company. (*Robertson* v. *Bullions ut supra.*)     Thus it was fully delivered and was beyond recall. It cetainly had as much binding force as if it had been presented only to the consistory, and not to the whole body of the corporation.   By the terms of the paper, the signers decline to act in their offices from that time forward ; and they follow up this refusal by ceasing to act.   In the act to provide for the incorporation of religious corporations (section 6) there is a provision for an election in case any trustee shall die, *refuse to act*, or remove ; which is a legislative declaration, that a refusal to act vacates the office.   So too, if a trustee withdraws from a religious society, so that it can be said that he no longer belongs to it, he ceases to be a trustee, and the society may elect another, even though he has not formerly resigned. (*Laight street Baptist church* v. *Noe and al.*, 12 How., 497.)

And can a person hold an office who declines to act in it ? What does the holding of an office consist in, except in the performance of official duties ?   Suppose that one of this bench were to file a paper, in the proper office, to the effect that he declined, from that time forth, to act as a justice of the Supreme Court, is there any doubt that such paper would be a resignation ?   True, the paper in question has the words, under the present pastor; but these words are to be understood as giving the reason for the resignation.   For it is plain that one cannot resign an office for a limited time, and then resume it when circumstances are more agreeable.   If, for instance, a director of a railroad company should deliver to the board a paper in the words, "I decline, from this time forth, to act as director under the present president," he could not be entitled to resume his office, in case the president should be removed.   A formal refusal to act in an office, addressed to the proper body, or person, must be considered a resignation, so that one may be substituted who will act.   And the proper body, or persons, to whom a resignation is to be

addressed, will usually be the one that can take proceedings
to supply the vacancy.   In the present case, the corporation
through its officers.

What could have been the object of this paper, other than
to relieve the signers from all further responsibility as officers?
It is plain that there was trouble in the church, and discord
in the consistory.   And the parties who signed the paper,
finding that the consistory could not agree, were unwilling to
act in a discordant body.   Being a majority, they could have
retained control of the affairs of the corporation, but they
preferred not to do this.   They, therefore, announced, not
merely to the consistory, but to the rest of the congregation,
their resignation of office, leaving the responsibility of all
future actions on the remaining officers.   And, in accordance
with this paper, they did not, for three months after, act in
the consistory; while the remaining members did continue
to act.

It may be well to go a little further in the history of this
case, as it is supposed to bear on the point now in question.

On the 3d day of May, 1869, the classis of Orange resolved
that the elders and deacons, aforesaid, be recommended to
resume their official duties.   This recommendation, of course,
was valuable, only as the opinion of wise and earnest men.
It could not affect the legal position of these persons, nor
could it make them officers of the corporation, if they had ceased
so to be.   On the 7th day of May, 1869, the signers of the
paper (excepting Terwilliger, who had moved away) met
together with John A. Niver, in the lecture room of the church,
and claimed to act as the consistory.   At this time the property
of the corporation, including the book of minutes, was in the
possession, or under the control of Mr. Connitt, claiming, as
pastor, to be president of the consistory.   These same per-
sons, excepting Terwilliger and John A. Niver, at several
times afterward met and claimed to be the consistory.   At a
meeting on the 17th of December, 1869, when were present
Daniel M. Schoonmaker, David Paliman, George W. Evans
Robert L. Thompson, and Albert Schoonmaker, claiming to

be the consistory, they elected David A. Decker, as elder, in place of Isaiah J. Whitter, and Levi V. Dupuy, and John Raymond, deacons, in place of Milton Terwilliger and John A. Niver. The usual notice was published for three Sundays, and these persons so elected were ordained by Rev. Mr. Spaulding, June 2d, 1870.

After the resignation of Paliman and others, on the 25th of January, 1869, meetings were held, from time to time, of the pastor and the remaining members, claiming to be the consistory.

They numbered, at the most, two, in addition to the pastor. At such a meeting, on the 5th of July, 1869, where were present, the pastor and John A. Niver, claiming to be the consistory, thus elected Hiram Niver, elder, in place of David Paliman; James E. Echect, elder, in place of Daniel M. Schoonmaker, and Justus Baker, deacon, in place of Albert Schoonmaker, for the unexpired terms of office. The usual notice was published for three Sundays, and the persons so elected were ordained by Mr. Connitt, July 25th, 1869.

And thus are composed the two bodies, each of whom claim to be the consistory.

We have nothing to do, in looking at this question, with the ecclesiastical merits of this sad controversy, or with the moral blame which must belong somewhere. The case does not show, and was not intended to show, where the little fire was which has kindled this great matter. We have only to decide who are the legal officers of the corporation; and that must depend, as was said before, principally on the effect of the paper signed by Paliman and others. Whether they acted wisely or not in signing it, is immaterial. If, as we are obliged to hold, it was a resignation of office, then they could not recall it. They ceased to be the legal officers of the corporation. They could not resume their offices. They were not members of the consistory, and their acts claiming to be the consistory are void. It is immaterial that they were the majority. Their resignation necessarily left the power with those who had not resigned, whether they were few or many.

It follows, from these views, that Paliman and the other signers had no authority to elect new members, consequently the persons so elected did not become officers of the corporation. The call to Mr. Demarest was, therefore, not made by legal officers, and is not binding on the corporation; and the individual defendants are not the consistory, or the legal officers of the corporation. It is necessary, next, to examine the claim of the plaintiffs to be such officers.

Passing over for the present, the question, what effect the resolution of the classis passed May 3d, 1869, had on Mr. Connitt's position, we find it undisputed that John A. Niver was a member of the consistory at the time of the resignation of Paliman and others.

It is undisputed, that at least, till May 3d, Mr. Connitt was pastor, and, therefore, a member of the consistory, and Mr. Whitter continued a member until about May 3d. These persons were in the actual possession and enjoyment of their respective offices. They met and acted, and as president of the consistory Mr. Connitt had possession of the book of minutes and the keys of the church. Whitter appears to have ceased to act about the 3d of May, and did not consider himself a member, as he says, having been elected in April, 1867. On the 5th of July, 1869, John A. Niver was one of the consistory, and Mr. Connitt claimed to be pastor. He was pastor, unless he had ceased so to be by the vote of the classis, May 3d, 1869; a point which will be examined hereafter. By their votes the three other plaintiffs were that day elected for the residue of terms, and these were the votes, it is to be remembered, of persons who, however few, had continuously claimed to be the officers of the corporation, and had been continuously in actual possession of their offices, and till May 3d, had been the only body claiming office. If, as we have seen, Mr. Paliman and his associates resigned their office, then it necessarily follows that these members of the consistory who did not resign, had the power to fill the vacancies. Since it is undisputed that vacancies are to be filled by the consistory (Constitution Dutch Church, ch. 1, act 3, sec.

485), it may be very unfortunate that this power should have been left in the hands of so small a number. But that is the fault of those who resigned. The corporation must have its officers; and if some of those who are elected desert their positions, those that remain must fill the places. The plaintiffs, therefore, leaving out, for the present, Mr. Connitt, are the consistory.

The next question is, whether Mr. Connitt is pastor; if not, when he ceased so to be?

Mr. Connitt was, on the 16th of February, 1866, called to this church and accepted the call. The call is a written instrument, executed in the name of the consistory, and signed by those who held the office. It specifies the work which he is to do; it agrees to pay him a certain salary, "as long as you continue the minister of the church," with the use of the parsonage; and it calls him "to be our pastor and teacher, &c.," "to fulfill the whole work of the gospel ministry, agreeable to the word of God, and the excellent rules and constitution of our Reformed Protestant Dutch Church, established in the last national synod held at Dordrecht, and ratified and explained by the ecclesiastical judicatory, under which we stand, and to which you, in accepting this call, must with us remain subordinate."

On the 3d of May, 1869, the classis of Orange, without trying Mr. Connitt, and without convicting him of any offence, and without any charge being made against him, voted as follows:

"*Resolved*, That the classis do, in virtue of their interest, power and duty in the care of the churches, dissolve the pastoral relation between Rev. George W. Connitt and the church of New Prospect."

Mr. Connitt appealed to the particular synod, claiming that the classis had no right to dissolve the pastoral relation for expediency. He claimed, also, that all further proceedings were stayed by the appeal, and that, therefore, he continued to be pastor until the appeal was decided. When the keys and records of the church were demanded from him on the

21st of May, 1869, by Mr. Paliman and his associates, claiming to be the consistory, he refused to deliver them.

On the first Sunday of July, Mr. Paliman and his associates invited Rev. Mr. Staats to preach. Mr. Connitt entered the pulpit and read a protest, claiming for himself the right to the pulpit.

On the 19th of July the classis of Orange enjoined him to deliver to the consistory the keys and the book of minutes, and to desist from attempting to preach in the church.

On the 29th of September, 1869, the classis of Orange proceeded to try him on several charges, in substance as follows: 1. That, after the alleged dissolution of the pastoral relation, he declared himself pastor. 2. That, after the consistory had notified him that his services were not desired, he persisted in claiming the office and preaching. 3. That, on the first Sunday of July, he entered the pulpit and claimed the right to it. 4. That, after the classis had enjoined him from preaching, he, with a deacon, assumed to elect two elders and a deacon. 5. That he ordained them. 6. That he preached August 1st. 7. That he refused to deliver to the consistory the book of minutes, August 2d. 8. That he notified Mr. Frazer not to preach in the church. 9. That he served on three of the consistory notice of an application to the Supreme Court for a mandamus, and caused a civil action to be commenced against three of the classis for their action as such.

On these nine charges the classis found him guilty, and voted to suspend him from the ministry until repentance.

From the vote of the classis of July 19, and that of September 29, he appealed to the particular synod.

On the 3d of May, 1870, the particular synod sustained the classis, and overruled all those appeals. Mr. Connitt appealed to the general synod from the three decisions.

In July, 1870, the general synod overruled the appeal from the first, viz., that of May 3, 1869, dissolving the pastoral relation; and he withdrew the other appeals.

On the 10th of August, 1870, the classis of Orange, without any further trial, reciting his refusal to deliver up the parsonage, and his attempting to collect by action his salary since May 3, 1869, deposed him from the ministry, and temporarily excommunicated him.

This is, in substance, a statement of the whole affair, omitting some attempts by the opposing parties to take and to retain forcible possession of the church property.

It will be readily seen that a written contract was made between Mr. Connitt and the corporation called the Reformed Protestant Dutch Church of New Prospect, and by its terms the parties are to be governed. It was a contract by which, for certain compensation, he agreed to render certain services. It is silent as to the time for which it is to continue. At this point we need not examine whether either party can determine it at will, or whether it continues for life.

In the view which we have taken of the first question, no dispute arises on this contract. The consistory of the church are, as we have shown, the plaintiffs. They do not desire to terminate this contract. Nor does he. Or, at least, if they so desire, that does not appear in this case. The defendants are only members of the corporation, which must act by its officers. As mere members of the corporation, the defendants cannot question its contracts or terminate them. A great deal was said on the argument as to the power of the classis to dissolve the pastoral relation; and reference was made to early rules and regulations of the Reformed Dutch Church, and to discussions which have arisen in a kindred church. But what is called the pastoral relation, so far as any civil rights are concerned, is but a matter of contract. It is like what might be called the choral relation, which arises when a choir is engaged. To dissolve the pastoral relation means to annul the contract between the pastor and the corporation. If the question were asked, has the classis power to annul the contract, when a church engage a choir of singers, or an organist, or a sexton, it would be answered very quickly in the negative. However much higher the position of a pastor may

be, however much more sacred his duties, however much more weighty his responsibilities, yet even his right to receive a salary must arise on a contract. He can sue for his salary on his written contract, or for work, labor and services. (*North Dutch Church* v. *Bradford*, 8 Cow., 497.) If, then, the relation between the pastor and the corporation, so far as any civil rights are concerned, is one of contract for services, how can that contract be annulled by any third party, unless the right to annul is expressly granted by the terms of the contract itself? In the present case, it is claimed, on the part of the defendants, that a certain voluntary assembly, not known to the law, not vested by the law with any powers, corporate, judicial or ministerial, has the right, whenever it thinks best, without any cause, except such as satisfies the minds of its members, to annul this contract, even contrary to the wishes of both parties. If such a power exists, it ought to be plain and unquestionably expressed, for it is very unusual. In the case of *Smith* v. *Nelson* (*ut supra*), it is said: "With respect to any contract between the minister and his people, it may be remarked of this, as of any other contract, that we cannot add anything, by implication, to the express terms of the contract itself. * * * When both parties to the contract are satisfied, and neither desires the relation to be dissolved, it is not for this court, at the instance of others not parties to the contract, to seek for understandings and implications by which to avoid it."

If we examine the call, which must be the written contract, the only language which bears on this point is the agreement as to the pastor's duty, above quoted. He is to fulfill the whole work of the gospel ministry, not only agreeably to the word of God, but also agreeably to the rules and constitution of the Reformed Dutch Church, as explained by the judicatory to which he and the people are subordinate. If, therefore, a civil controversy were to arise between the corporation and the pastor, involving the question whether he was fulfilling that work, any explanation of the rules of the Dordrecht synod, made by the proper judicatory, might be appropriate

in evidence.   But it is not alleged that Mr. Connitt was not ready to fulfill the work of the ministry agreeably to the word of God and these rules.   And even if we were to assume that the individual defendants were the officers of the corporation, still there was no question between Mr. Connitt and the corporation as to his fulfillment of his duties prior to May 3, 1869, when the classis passed the resolution.   Supposing, therefore, those defendants to have been the consistory, and the classis, in the character of a *quasi* arbitrator, to have been called on to explain the rules and constitution, still there is nothing decided showing a violation of the contract.

In the case of *Austin v. Searing* (16 N. Y., 112), it was claimed that, by the constitution of a voluntary association, certain powers and duties were granted by the grand lodge over the subordinate lodges.   The court say: " But were it distinctly averred that the defendants had subscribed the constitution of the grand as well as of the subordinate lodge, I should be of the opinion that public policy would not permit of parties binding themselves by such engagements. * * * To create a judicial tribunal is one of the functions of the sovereign power.   And although parties may always make such tribunal for themselves in any specified case, by a submission to arbitration, yet the power is guarded by the most cautious rules.   A contract that the parties will submit confers no power on the arbitrator; and even when there is an actual submission, it may be revoked at any time."

The principles of that case apply here.   Even assuming that there were a controversy between the corporation and Mr. Connitt, the classis is not a judicial tribunal to decide it. And if it be claimed that the contract and the constitution of the church makes the classis an arbitrator, still a contract to submit confers no power.   The defendants do not recognize the fact that the law has given the absolute power to religious corporations severally to control their own affairs.   (*Robertson v. Bullions, ut supra.*)   They have the right to employ as a pastor any one whom they choose, whether the classis and synod and presbytery approve or not.   The classis and synod

and presbytery may suspend and excommunicate pastors and people all together; but this does not affect the right of the corporation to employ the pastor and to pay him. Their contract makes him their pastor. (*Youngs* v. *Ransom*, 31 Barb., 49.) "Neither presbytery nor synod," says Judge SELDEN, in *Robertson* v. *Bullions* (*ut supra*), "had any control over the associate congregation of Cambridge, in respect to the minister whom they should employ. That depended on the trustees and a majority of the congregation. His deposition or excommunication had nothing to do with the right of the congregation to employ him, so far as the administration of its temporalities was concerned."

It is, undoubtedly, true as to this contract, as to any other similar one, that the performance, or ability and readiness to perform, by the party who is to render service, is the ground of compensation. This is recognized in *Smith* v. *Nelson*, and is decided in *North Dutch Church* v. *Bradford*.

In the latter case, a minister sued for his salary accrued after his suspension. It was held, that as he could not perform the services, he could not recover the pay. To this extent the action of the classis may affect the rights of a pastor and affect his relation. It is his contract to perform ministerial services; so if he is unable to perform them, he forfeits his contract, and it may be rescinded by the other party. And as the ecclesiastical body to which he belongs (if he belongs to any) may take away his ministerial character, they may thus disable him from fulfilling his contract. It will still, however, remain the privilege of the other party to the contract to continue him as their pastor if they choose. Beyond what is thus explained, I see no power in the classis or other ecclesiastical body.

In this connection I may say that I do not think that this court has anything to do with the proceedings by which an ecclesiastical body choose to suspend or depose one of its clergy.

No legal question can arise as to the regularity of the proceedings; because in such a voluntary association, regularity

or irregularity, are merely arbitrary. The same association which prescribes may vary or break its regulations; and as these regulations are not recognized by law, it is of no consequence as to civil rights whether they are observed or not.

If Mr. Paliman and his associates were the legal officers of the corporation, and being dissatisfied with Mr. Connitt, had sought to annul the contract, it would have been necessary then to inquire whether this contract is for life or is terminable by either party, at will. If terminable at will, then it would be idle to examine as to the power of the classis to do what either party could do for themselves.

The power which is claimed for the classis would be of consequence only if the contract be one for life. In Massachusetts it has been held that the settlement of a congregational clergyman was for life. But in the first case on the question (*Avery* v. *Tyringham*, 3 Mass., 160) Chief Justice PARSONS remarks that it is a general rule that an office is holden at the will of either party. For certain reasons, ancient usage among others, he holds that a different rule prevails as to *the settlement* of a clergyman. In the view which has been taken of the present case, the question does not arise. But, certainly, if ancient usage made the contract one for life, usage has reversed the rule. And without deciding this point, in passing it may be remarked that Chief Justice PARSONS cites a case in Massachusetts of an action against a clergyman for damages for leaving his congregation. If such an action would now lie, there would, perhaps, be more permanence to the pastoral relation. And it should be observed that the Massachusetts decisions may not be applicable to this question here. The settlement of a clergyman there was, at that time, made in obedience to a constitutional provision, and was accompanied by the payment of a sum of money called his "settlement," additional to the salary. And it is not on the expressed terms of the contract, but altogether on other facts that the court, in the case cited (followed in other cases) held, that the contract was for life. In the case cited once or twice before from the Vermont reports, the

chief justice remarks: The whole difficulty which has been so disastrous in its consequences, both here and elsewhere, has arisen from the attempt to exercise an authority where none is possessed, to assume powers of a legislative and judicial character which are not given, and to claim for them attributes and effects which can only belong to tribunals having a legal existence under the supreme power of the State. And, as is too often the case when men feel power, though they have it not, they "forget right." Something of this is applicable here; and the examination of the case has satisfied us of the wisdom of the legislature in leaving each religious corporation to manage its own affairs. Patience, forbearance, and a Christian spirit will usually bring controversies to an end, while so-called trials before ecclesiastical bodies seldom restore harmony or produce a satisfactory result. There are many reasons for this fact, which it is unnecessary to state.

If we look at the final result of this controversy, we find Mr. Connitt deposed and excommunicated for no immorality, crime, or neglect of duty. Whose fault the original disagreement was, does not appear.

No examination has ever been made on that question. The first resolution of any ecclesiastical body upon this subject, that which purported to dissolve the pastoral relation, was based only on expediency; and the only charge which the complaints presented was that they had lost confidence in him. The charges on which he was finally deposed are, in substance, but three. 1st. That he insisted that the classis had no power to deprive him of his office for expediency. 2d. That he insisted that pending his appeal he remained pastor. 3d. That he commenced an action for his salary, called fraudulent probably because the summons was not served on Mr. Paliman and his associates. On the first and third of these charges it is unnecessary to say anything further. As to the second, of course, a voluntary association may make such rules as to the effect of appeals as it chooses. No regulations on this point appear to exist in the constitution of this church. In legal proceedings the effect is usually regulated by positive

enactment.   On general principles it would seem that a legal appeal to a higher tribunal does stay proceedings. (*Penhallow* v. *Doane's Adm'r*, 3 Dallas, 54, and *seq.*; 2 Domat, 686.)   But even if Mr. Connitt had been in error in every respect, yet as the error was one of judgment, not of heart, excommunication, even temporary, appears to a civil court, if not to an ecclesiastical tribunal, a harsh punishment.

The conclusion is:   1st. That the plaintiffs are the consistory and legal officers of the corporation called the Reformed Protestant Dutch Church, of New Prospect, and the individual defendants are not.

2d. That George W. Connitt having been, in fact (whether rightfully or wrongfully,) suspended, and then deposed from the ministry, the plaintiffs, as officers of the corporation, had the right (if they choose so to do) to terminate the contract between him and the corporation, at any time on or after the day when he was suspended, viz., September 29th, 1869.

3d. That until the corporation, through its legal officers, shall terminate the contract, Mr. Connitt is, and will remain their pastor, so far as any civil rights are concerned, and is, and will be entitled, therefore, to his salary.

Judgment for the defendants.