O'Donovan *v.* Chatard.

Filed Oct. 7, 1884.

---

No. 11,507.

## O'DONOVAN *v.* CHATARD.

CHURCHES.—*Jurisdiction.*—No suit can be maintained by a priest of a Catholic church against his bishop for removing him from his office of priest, the civil courts in such cases having no authority to inquire as to the rightfulness of ecclesiastical decision.

From the Superior Court of Marion County.

*R. Hill* and *J. W. Nichol*, for appellant.

*T. A. Hendricks, A. W. Hendricks, C. Baker, O. B. Hord, A. Baker* and *E. Daniels*, for appellee.

FRANKLIN, C.—Appellant brought this action against appellee to recover damages, alleging in his complaint, as a cause therefor, that appellee, as bishop in the Catholic church of the proper diocese, had, without jurisdiction and without just cause or provocation, removed appellant as priest in said church, at Brownsburg, Hendricks county, Indiana.

On motion of appellee parts of the complaint were stricken out, and then a demurrer was sustained to the remainder of the complaint, and judgment was rendered for appellee. On appeal to the general term of the court, the judgment of the special term was affirmed.

The question presented by counsel in this court is, can a priest in the Catholic church maintain an action in the civil courts against the bishop for simply removing him from office?

Appellant, in his brief, says: " Had appellant been charged with heresy in faith or practice, or the violation of any rule of the Catholic church, under well settled rules, civil courts would not have heard his complaint, but would have remitted him to his church judicatories, reminding him that when he became a priest in the Catholic church he had agreed to submit such controversies to the decision of these tribunals."

This being true, can the priest raise an issue with his bishop, and submit to the civil courts, whether the action of the bishop in matters of discipline and church government was right or wrong, reasonable or unreasonable, wise or unwise, and have the opinion of a jury upon that subject?

In the case of *Watson* v. *Jones*, 13 Wall. 679, it is said, on page 728: " In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of

any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

In the case of *Grimes* v. *Harmon,* 35 Ind. 198, 254, (9 Am. R. 690) it was held: "That over the church, as such, the legal tribunals do not have, or profess to have, any jurisdiction whatever, except to protect the civil rights of others and to preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church judicatures to which they have voluntarily subjected themselves. But the civil courts will interfere with churches and religious associations, and determine upon questions of faith and practice of a church when rights of property and civil rights are involved."

In the case of *Chase* v. *Cheney,* 58 Ill. 509 (11 Am. R. 95), it was held, that the constitution guarantees "from all interference by the State, not only each man's religious faith, but his membership in the church, and the rights and discipline which might be adopted. The only exception to uncontrolled liberty is, that acts of licentiousness shall not be excused, and practices inconsistent with the peace and safety of the State, shall not be justified. Freedom of religious profession and worship can not be maintained, if the civil courts trench upon the domain

of the church, construe its canons and rules, dictate its discipline, and regulate its trials."

In the case of *White Lick Quarterly Meeting* v. *White Lick Quarterly Meeting*, 89 Ind. 136, it is said, on page 151 : " Civil courts in this country have no ecclesiastical jurisdiction. They can not revise or question ordinary acts of church discipline, and can only interfere in church controversies where civil rights or the rights of property are involved. Where a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the civil right, and nothing more, taking the ecclesiastical decisions, out of which the civil right has arisen, as it finds them, and accepting those decisions as matters adjudicated by another jurisdiction. The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters which concern the doctrines and discipline of the respective religious denominations to which they belong. When a person becomes a member of a church he becomes so upon the condition of submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded. This doctrine inevitably results from that total separation between church and state which exists within the limits of the United States, and is essential to the full enjoyment of the guaranteed rights of American citizenship. Very naturally a different rule prevails in England, where church and state are united."

In the case of *German Reformed Church* v. *Seibert*, 3 Pa. St. 282, it is said on page 291 : " The decisions of ecclesiastical courts, like every other judicial tribunal, are final ; as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine ; and civil courts, if they should be so unwise as to attempt to supervise their

judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

In the case of *Shannon* v. *Frost*, 3 B. Mon. 253, it is said: " This court, having no ecclesiastical jurisdiction, can not revise or question ordinary acts of church discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. And these we must decide, as we do all other civil controversies brought to this tribunal for ultimate decision. We can not decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church. * * * The judicial eye of the civil authority of this land of religious liberty, can not penetrate the veil of the church, nor can the arm of this court either rend or touch that veil for the forbidden purpose of vindicating the alleged wrongs of the excinded members. When they became members they did so on the condition of continuing or not, as themselves and their church might determine. In that respect they voluntarily subjected themselves to the ecclesiastical power, and can not invoke the supervision or control of that jurisdiction by this or any other civil tribunal."

The Supreme Court of Illinois, in the case of *Ferraria* v. *Vasconcellos*, 31 Ill. 25, adopts and approves this language of the Kentucky court. See, also, *Bouldin* v. *Alexander*, 15 Wall. 131.

In the case of *Fitzgerald* v. *Robinson*, 112 Mass. 371, where an action was brought by a parishioner against a priest on account of excommunication, it was held that, " If the defendant was competent to pass sentence of excommunication, we can not inquire into the grounds and regularity of the proceedings." See, also, *Grosvenor* v. *United Society*, 118 Mass. 78.

In the case of *State of New Jersey* v. *Rector*, 28 Alb. L. J. 111, it was held that courts of law will interpose to control the

proceedings of ecclesiastical bodies when a right to property is involved, but in no other instance.

In the case of *Chase* v. *Cheney, supra,* it is said on page 535: "We have no right, and, therefore, will not exercise the power, to dictate ecclesiastical law. We do not aspire to become *de facto* heads of the church, and, by construction or otherwise, abrogate its laws and canons. We shall not inquire whether the alleged omission is any offence. This is a question of ecclesiastical cognizance. This is no forum for such adjudication. The church should guard its own fold; enact and construe its own laws; enforce its own discipline; and thus will be maintained the boundary between the temporal and spiritual power."

In the case of *Gaff* v. *Greer,* 88 Ind. 122 (45 Am. R. 449), this court approved the rule announced in the case of *Shannon* v. *Frost, supra,* and adds, "The same rule is asserted in the following cases: *State, ex rel.,* v. *Farris,* 45 Mo. 183; *Robertson* v. *Bullions,* 9 Barb. 64, 134; *German, etc., Church* v. *Seibert,* 3 Pa. St. 282; *Gibson* v. *Armstrong,* 7 B. Mon. 481; *Harmon* v. *Dreher,* 1 Speer Eq. 87." And it is further said, that "These authorities establish the proposition that the decision of one of these judicatories is binding upon the courts where such questions arise. It is said, however, that the appellants had no notice, and for that reason the order is a nullity. This was a question for the presbytery."

In the case of *Chase* v. *Cheney, supra,* it was further held that the civil courts will interfere with churches and religious associations when the rights of property or civil rights are involved, but will not revise the decisions of such associations upon ecclesiastical matters, merely to ascertain their jurisdiction; also, that the decisions of the ecclesiastical courts are final as to what constitutes an offence against the discipline of the church. In the dissenting opinion the question of jurisdiction, as decided, is stated as follows: "We understand the opinion as implying, that in the administration of ecclesiastical discipline, and where there is no other right of

property involved than the loss of the clerical office or salary, as an incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, under the laws or canons of the religious association to which it belongs, and its decision of that question is binding upon secular courts."

The case of *Connitt* v. *Reformed, etc., Church*, 4 Lans. 339, approved the rule established in the case of *Chase* v. *Cheney, supra*. And in that case it is further said: "We can not fail to see, I think, that in this case the *pastoral relation* established between Mr. Connitt and the church of New Prospect, was as purely ecclesiastical as that in which he stood as minister in the Reformed church, of America. His rights and duties as minister, and as pastor, were ecclesiastical, not civil; and the ecclesiastical tribunals of the Reformed church, of America, alone could suspend or depose him from the ministry, or dissolve the relations which existed between him and the church, as pastor and people. His duties as minister, when placed over this church, were of a character peculiarly within the cognizance of the authorities of the church organization to which he belonged, and were to be performed in pursuance of the rules and usages of that organization; as minister and pastor he was amenable to no other organization; and such organization, through its different instrumentalities, consistories, classes, and synods, had entire control of both pastor and people in all ecclesiastical matters. The secular courts have no jurisdiction over the ecclesiastical rights of either pastor or people, and neither can resort to those courts for the protection or enforcement of such rights. * * Now, inasmuch as the relation in question is not a civil one, dependent upon municipal law, but wholly ecclesiastical, and wholly dependent upon ecclesiastical rule, and its administration, by the church judicatories, it is not for this court to review the decisions and judgments of such church judicatories. Over them, and the administration of their rules and usages, we have no jurisdiction. No civil right is infringed by them in dissolving the pastoral relation. Mr. Connitt has no right to

the continuance of such relation, cognizable in the civil courts,. and, consequently, any wrong done him by the church courts, in its dissolution, is not one cognizable by the civil courts, either in an original or appellate proceeding. The rights to salary, etc., it is true, is, by contract, made dependent upon the continuance of the pastoral relation. But this does not bring such continuance within the cognizance of the civil courts. They can inquire only into the fact of the continuance. The rela- tion is, nevertheless, controlled by the ecclesiastical authori- ties; and the fact of their dissolution of it is conclusive." See the cases of *Dutch Church* v. *Bradford,* 8 Cow. 457, and *Robertson* v. *Bullions, supra.*

In the complaint under consideration, it is shown that the plaintiff was notified by the defendant that his case would be submitted to the diocesan councillors. But plaintiff in- sists that he was not notified that any charges had been pre- ferred against him, or of the time and place of their hearing,. as is required by the "*instructio.*" But thereafter, to wit, on the 2d day of December, 1880, the plaintiff was served with official notice by said defendant that his case for the non- payment of $300, with interest, to said Hart, so claimed to be due as aforesaid from said congregation of St. Malachi's. church, had been by him referred to the diocesan committee,. and that on December 1st, 1880, the diocesan councillors had decided adversely to plaintiff, and that in consequence thereof said defendant informed plaintiff that unless said sum of $300, with interest due, should be paid to said Hart within two weeks from said 1st day of December, 1880, plaintiff would cease *ipso facto* to be rector of the congregation of Brownsburg, and likewise all plaintiff's faculties, of every nature, as such priest or rector, would also cease. That he failed to pay the money within the time, and the defendant. removed him from his said clerical office of priest and rector, and deprived him of all the benefits and emoluments thereof.

The complaint shows an adjudication of the plaintiff's case·

by the proper ecclesiastical authorities of the church to which he belonged, and, according to the foregoing authorities, it is not for this court to inquire whether that adjudication was regular or irregular, right or wrong; it is final in the premises. Another case between these same parties, growing out of the same transaction, and in relation to the church property, has heretofore been before this court. *Chatard* v. *O'Donovan*, 80 Ind. 20 (41 Am. R. 782). In the conclusion of the opinion in that case this court said : " We are, however, of the opinion that the relation of the parties was more like that of master and servant—the possession of the priest being, in fact, the possession of his superior, the bishop, who had power, at any time and upon his own judgment or discretion, to remove one and instal another in the office of pastor, and in the possession of the property of the office."

If master and servant was the true relation between the parties, the master certainly had the right to dissolve that relation, without giving the servant a right to an action in the civil courts for its mere dissolution; or, if the bishop had discretionary powers to remove the priest, clearly no action at law would lie for the exercise of such discretionary powers.

Viewing this case in all the lights surrounding it, we see no principle of the law upon which this action can be maintained.

There is no error in striking out parts of the complaint, or in sustaining a demurrer to it. The judgment ought to be affirmed.

Per Curiam.—It is therefore ordered, upon the foregoing opinion, that the judgment of the general term of the court below be, and it is in all things affirmed, with costs.

Filed Sept. 25, 1884.